UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

AMERICAN TRANSIT INSURANCE COMPANY,

Plaintiff,

-against-

ADVANCED RECOVERY EQUIPMENT AND SUPPLIES LLC, DANIEL HOROWITZ, RUSSEL GLADKOVITSER A/K/A RUSLAN GLADKOVITSER, JAY ROBINZON, SIMON PELMAN, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,

Defendants.

CIVIL ACTION

25-CV-3940

COMPLAINT

(TRIAL BY JURY DEMANDED)

Plaintiff American Transit Insurance Company ("Plaintiff"), by its attorneys, Manning & Kass, Ellrod, Ramirez, Trester LLP, for their Complaint against Defendants Daniel Horowitz ("Horowitz"), Russel Gladkovitser ("Gladkovitser"), Jay Robinzon ("Robinzon"), Simon Pelman ("Pelman"), (Horowitz, Gladkovitser, Robinzon, and Pelman are collectively referred to as the "Retail Owners"), Advanced Recovery Equipment and Supplies LLC ("Advanced Recovery") (Retail Owners and Advanced Recovery are collectively referred to as "Retail Defendants"), John Does 1 through 5 and ABC Corporations 1 through 5 (collectively referred to herein with the Retail Defendants as "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1. From at least June 2012 and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiff, through New York State's No-fault system.

2. This action seeks to recover more than $1,500,000.00 Defendants stole from Plaintiff through the submission of thousands of false and/or fraudulent insurance claims for durable medical equipment ("DME") devices, in particular, Continuous Passive Motion ("CPM") machines, Cold Water Circulation Units also known as cold therapy units ("CTUs") and

Sustained Acoustic Medicine ("SAM") units and accompanying patches (collectively "Rental DME"), as well as DME and/or orthotic devices, in particular, back, shoulder, and knee braces and other orthotic devices. As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical purposes by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpool, CPMs, CTUs and SAM units; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes. Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3. At all relevant times mentioned herein, each and every piece of Rental DME, DME and/or orthotic device supplied by Advanced Recovery was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4. To execute the scheme to defraud alleged herein, the Retail Owners, through Advanced Recovery, entered into arrangements with, *inter alia*, one or more medical clinics operating in the New York metropolitan area, including Manhattan, Bronx, Kings and Queens counties, among others, that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5. Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are

not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

> (i) upon information and belief, ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME, including Rental DME to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Defendants, among others;
>
> (ii) upon information and belief, ensuring that the prescriptions were sufficiently generic and/or formulaic so that the nature, quality, cost, and medical necessity of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone; and/or
>
> (iii) upon information and belief, ensuring that the prescriptions were provided directly to Advanced Recovery to ensure that Advanced Recovery could bill Plaintiff to purportedly fill the prescription rather than allow the possibility that the Covered Person may fill the prescription at a DME retailer of their own choosing.

6. The use of generic descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the Rental DME, DME and/or orthotic devices prescribed to the Covered Person, if any items were legitimately prescribed at all; (ii) misrepresent the nature and quality of the items that were dispensed to the Covered Person, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiff, in particular.

7. Pursuant to the fraudulent prescriptions, Advanced Recovery routinely provided (or purported to provide) a nearly identical battery of Rental DME for the same and/or similar duration, as well as other standard DME and/or orthotic devices, to persons injured in automobile accidents insured by Plaintiff (hereinafter "Covered Persons"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiff in particular.

8. On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9. In many instances, the Retail Owners submitted to Plaintiff, through Advanced Recovery, prescription forms which they knew to be intentionally generic, in order to misrepresent the number and/or quality of Rental DME, DME and/or orthotic devices actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10. In furtherance of the scheme to defraud alleged herein, Advanced Recovery purchased the cheap DME and/or orthotic devices in bulk and routinely misrepresented the nature, quality, and cost of the items in order to fraudulently obtain and maximize its reimbursement far in excess of the amounts it was entitled to receive under the No-fault Law.

11. After obtaining the fraudulent prescriptions from the No-fault Clinics, the Retail Defendants, through Advanced Recovery, generated and submitted bills to Plaintiff, among others, knowingly misrepresenting the actual amounts they paid for the Rental DME, DME and/or orthotic devices, and also knowingly misrepresenting the nature and quality of the of Rental DME, DME and/or orthotic devices, and the medical necessity of the purportedly prescribed DME and/or orthotics.

12. At all relevant times mentioned herein, in support of their claims for reimbursement, and to facilitate the fraud described herein, the Retail Defendants, through Advanced Recovery, generated delivery receipts that included a space for the patient's signature to document receipt of each item for which the Retail Defendants, through Advanced Recovery, billed Plaintiff.

13. On information and belief, often pursuant to the agreements between the Retail Defendants and the No-fault Clinics, patients were directed to sign these delivery receipts upon presenting to the No-fault Clinics, irrespective of whether any Rental DME, DME and/or orthotic devices were provided to the patient at that time. The Retail Defendants then submitted to Plaintiff the signed delivery receipts as purported evidence of Rental DME, DME and/or orthotic devices allegedly supplied to a patient, when, in fact, no DME or orthotic device was ever supplied to the patient.

14. In order to execute the scheme to defraud, at all relevant times mentioned herein, the Retail Defendants, through Advanced Recovery, engaged in one or more of the following actions: (i) paying kickbacks or other financial compensation to No-fault Clinics in exchange for fraudulent prescriptions of Rental DME, DME and/or orthotic devices; (ii) obtaining prescriptions that were provided pursuant to a predetermined course of treatment as opposed to medical need; (iii) obtaining and submitting to insurers, in general, and Plaintiff, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered; (iv) arranging for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery of receipt forms pre-signed by Covered Persons to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiff, in particular, and (v) systematically submitting bills to insurers, in general, and Plaintiff, in particular, for Rental DME, DME and/or orthotic devices with virtually every Covered Person receiving substantially similar Rental DME for the same and/or similar duration, as well as other Rental DME, DME and/or orthotic devices.

15. At all relevant times mentioned herein, each and every bill and supporting documentation submitted by Advanced Recovery contained the same or similar false representations of material facts, including, but not limited to one or more of the following: (i)

false and misleading statements as to the nature, quality and cost of the Rental DME, DME and/or orthotic devices purportedly supplied to Covered Persons; (ii) false and misleading statements as to the amounts Advanced Recovery was entitled to be reimbursed under the No-fault Law; (iii) false and misleading statements that the Rental DME, DME and/or orthotic devices allegedly supplied were in fact the items supplied to the Covered Persons; (iv) false and misleading prescriptions for the Rental DME, DME and/or orthotic devices purportedly supplied to Covered Persons, which generically described the item(s) in order to conceal the nature, type, and quality of item(s) being prescribed and/or provided; and (v) false and misleading prescriptions for Rental DME, DME and/or orthotic devices, concealing the fact that the Rental DME, DME and/or orthotic devices either were not prescribed as alleged, or were prescribed and supplied pursuant to a pre-determined, fraudulent protocol, whereby Advanced Recovery paid kickbacks to No-fault Clinics to induce the No-fault Clinics to provide fraudulent prescriptions for large amounts of substantially similar, medically unnecessary Rental DME, DME and/or orthotic devices. All of the foregoing was intended to manipulate the payment formulas under the No-fault Law in order to maximize the charges that Advanced Recovery could submit to Plaintiff and other insurers under the No-fault Law.

16. In carrying out the scheme to defraud, Defendants stole in excess of $1,500,00.00 from Plaintiff by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

**STATUTORY/REGULATORY SCHEME**

17. Pursuant to the No-fault Law, Plaintiff is required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York. Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

18. As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiff for Rental DME, DME and/or orthotic devices that were never provided, not provided as billed or, if provided, were of inferior quality relative to what was represented to have been provided in the bills submitted to Plaintiff, and/or were otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received substantially similar Rental DME, DME and/or orthotic devices. Exhibit "1" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiff to Advanced Recovery for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

19. Advanced Recovery is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law. In exchange for its services, Advanced Recovery accepted assignments of benefits from Covered Persons and submitted claims for payment to No-fault insurance carriers, in general, and to Plaintiff, in particular.

20. In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq.*, Advanced Recovery submitted its claims to Plaintiff using the claim forms prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), including the "No-Fault Assignment of Benefits Form" or form "NF-AOB" and a bill in the form of the "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form (such as the "Health Insurance Claim Form" or "CMS Form 1500").

21. At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiff by Advanced Recovery contained the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto…commits a fraudulent insurance act, which is a crime….

22. At all relevant times mentioned herein, Advanced Recovery identified the Rental DME, DME and/or orthotic devices it purported provided to Covered Persons on the claim forms using Healthcare Common Procedure Coding System (HCPCS) Level II Codes, a standardized coding system maintained by the Centers for Medicare & Medicaid Services (CMS) used to identify services not identified in the American Medical Association's Current Procedural Terminology (CPT) code set, including, *inter alia*, durable medical equipment and orthotic devices.

23. At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiff was (and is) required to promptly process claims within 30 days of receipt of proof of claim.

24. At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service-related expenses. Under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

25. By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

26. At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

27. At all relevant times mentioned herein, Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services..."

28. Effective October 6, 2004, the Department of Financial Services, through the Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68

*et. seq*.), established a fee schedule for the reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances.

29. The 28th Amendment to Regulation 83 provided:

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

30. Effective July 11, 2007, for Rental DME, DME and/or orthotic devices provided up to and including April 3, 2022, the WCB established a fee schedule for DME and orthotic devices by also adopting the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances (hereinafter the "Medicaid DME Fee Schedule"). 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021).

31. In view of the adoption by the WCB of the Medicaid DME Fee Schedule, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Medicaid DME Fee Schedule that was, and is, in effect at all relevant times mentioned herein prior to April 4, 2022.

32. Accordingly, at all relevant times mentioned herein for Rental DME, DME and/or orthotic devices provided prior to April 4, 2022, providers of DME are entitled to reimbursement

in the amounts set forth in the Medicaid DME Fee Schedule. At all relevant times mentioned herein, with respect to items not listed on the Medicaid DME Fee Schedule provided prior to April 4, 2022 (hereinafter "Non-Medicaid DME Fee Schedule" items), the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public (sometimes referred to herein as the "Lesser of Standard"). 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021).

33. At all relevant times mentioned herein prior to April 4, 2022, under the Medicaid DME Fee Schedule, providers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule." 12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

34. Furthermore, at all relevant times mentioned herein prior to April 4, 2022, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

35. At all relevant times mentioned herein prior to April 4, 2022, the total monthly rental charge for equipment, supplies and services billed under codes listed in the Fee Schedule is ten percent (10%) of the listed maximum reimbursement amount.

36. At all relevant times mentioned herein prior to April 4, 2022, For DME billed under HCPCS codes that are recognized under the Fee Schedule, but do not contain a maximum reimbursement amount, the maximum charge for a monthly rental is ten percent (10%) of the acquisition cost for the DME, which includes all supplies that are provided with the DME rental. *See Government Employees Insurance Company v. MiiSupply LLC,* Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019).

37. By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which was to become effective June 7, 2021, with the result that the Medicaid DME Fee Schedule and the Lesser of Standard remained effective for Workers' Compensation and No-fault claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard on April 4, 2022. New York Workers' Compensation Board Bulletin No. 046-1408 (May 24, 2021) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1408.jsp) and Bulletin No. 046-1496 (February 3, 2022) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1496.jsp).

38. In relevant part, for Rental DME, DME and/or orthotic devices provided on or after April 4, 2022, the WCB established its own fee schedule for DME and orthotic devices to replace its prior adoption of the Medicaid DME Fee Schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances. (hereinafter

"WCB DME Fee Schedule") *See* 12 N.Y.C.R.R. § 442.2(a) (WCB DME Fee Schedule and Medicaid DME Fee Schedule are collectively referred to as the "Fee Schedule").

39. Like the Medicaid DME Fee Schedule, the WCB DME Fee Schedule lists DME and orthotic devices by their corresponding HCPCS Level II Codes.

40. With respect to rental DME, at all relevant times mentioned herein on or after April 4, 2022, under the WCB DME Fee Schedule, providers of rental DME are limited to as follows:

> The maximum permissible monthly charge for the rental of durable medical equipment shall be the rental price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule multiplied by the total number of months or weeks respectively for which the durable medical equipment is needed. In the event the total rental charge exceeds the purchase price, the maximum permissible charge for the durable medical equipment shall be the purchase price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule, whether or not the claimant keeps the durable medical equipment or returns it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

41. With the exception of, among other things, the prior authorization requirement for DME either not listed on the WCB Fee Schedule or listed without a maximum reimbursement amount, the WCB DME Fee Schedule applies to the reimbursement under the No-fault Law of items listed in the WCB DME Fee Schedule provided on or after April 4, 2022.

42. To address the potential for fraud and abuse, the elimination of a cost-containment system, and the possibility for nefarious DME providers to bill for DME at exorbitant, unchecked rates in the No-fault context by the WCB's elimination of the Lesser of Standard for reimbursement of items not listed on the WCB DME Fee Schedule, by emergency adoption of the 36th Amendment to Regulation 83 dated April 4, 2022, the DFS reinstated the Lesser of Standard for reimbursement of DME under the No-fault law.

43. By Emergency Adoptions dated June 30, 2022, September 27, 2022, and December 28, 2022, DFS extended its reinstatement of the Lesser of Standard for reimbursement of DME under the No-fault law, in each instance, for an additional 90 days.

44. DFS promulgated its final Adoption of the 36th Amendment to Regulation 83, including its reinstatement of the Lesser of Standard and clarification as it relates to rental items, effective February 15, 2023, which states as follows:

> **<u>Part E. Durable medical equipment fee schedule</u>**.
>
> (a) This Part shall apply to durable medical equipment not listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule and to durable medical equipment listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule for which no fee for purchase, rental, or both has been assigned.
>
> (b) As used in this Part, acquisition cost means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax.
>
> (c) The maximum permissible purchase charge for such durable medical equipment shall be the lesser of the:
>
> (1) acquisition cost plus 50%; or
>
> (2) usual and customary price charged by durable medical equipment providers to the general public.
>
> (d) (1) On and after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth of the acquisition cost to the provider. Rental charges for less than one month shall be calculated on a pro-rata basis using a 30-day month.
>
> (2) The total accumulated rental charge for such durable medical equipment shall be the least of the:
>
> (i) acquisition cost plus 50%;
>
> (ii) usual and customary price charged by durable medical equipment providers to the general public; or
>
> (iii) purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

https://www.dfs.ny.gov/system/files/documents/2023/02/rf_ins_83_amend36_text.pdf.

45. Accordingly, at all relevant times mentioned herein for Rental DME, DME and/or orthotic devices provided from April 4, 2022 through the present, providers of DME are entitled to reimbursement in the amounts set forth in the WCB DME Fee Schedule. At all times relevant times mentioned herein from April 4, 2022 through the present, with respect to DME items that are not listed on the WCB DME Fee Schedule and/or listed on the WCB DME Fee Schedule but for which no fee has been assigned (hereinafter "Non-WCB DME Fee Schedule" items) (Non-WCB DME Fee Schedule items and Non-Medicaid DME Fee Schedule items are collectively referred to as "Non-Fee Schedule" items), the maximum permissible reimbursement shall be determined by application of the Lesser of Standard as reflected in the Emergency Adoption of the 36th Amendment to Regulation 83 dated April 4, 2022, extended by Emergency Adoptions dated June 30, 2022, September 27, 2022, and December 28, 2022, and thereafter in the Final Adoption of the 36th Amendment to Regulation 83, effective February 15, 2023. 11 N.Y.C.R.R, § App.17-C Part E.

46. At all relevant times mentioned herein from April 4, 2022 through the present, a provider's acquisition cost is "the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax. 11 N.Y.C.R.R. § App.17-C Part E(b) (promulgated by April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022 Notices of Emergency Adoption, and Final Adoption effective February 15, 2023).

47. At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

48. Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

49. At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiff by the Retail Defendants, through Advanced Recovery, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the Rental DME, DME and/or orthotic devices provided, if provided at all, as well as the nature, quality, and medical necessity of the billed-for Rental DME, DME and/or orthotic devices. To the extent the Rental DME, DME and/or orthotic devices were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need, and was billed in an amount far in excess of what the Retail Defendants were entitled to be reimbursed.

50. On information and belief, in furtherance of the scheme to defraud alleged herein, Advanced Recovery as a matter of pattern, practice and protocol, routinely provided Covered Persons with expensive Rental DME, DME and/or orthotic devices that were medically unnecessary and provided as part of an elaborate kickback scheme with the No-fault Clinics for unnecessary referrals in order to maximize reimbursement.

51. As part of a fraudulent protocol of treatment, after receiving a standard battery of medical treatment, including the provision of several pieces of DME such as cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools; back braces, cervical collars, knee braces, and/or shoulder braces, many of the Covered Persons are eventually referred for arthroscopic surgery at

ambulatory surgical centers ("ASCs") throughout New York and New Jersey. These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medical necessary. On the same day as the surgery, and/or within a few short days of the surgery, Advanced Recovery, among others, delivers to the Covered Persons expensive rental and/or compression devices that are not medically necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration. In many cases, the Covered Persons receive four or more such medically unnecessary items from the providers of rental and/or compression devices, for up to 28 days or longer, in some cases exceeding $10,000.00 in a total cost for all of the items, as part of the scheme to financially enrich the providers expensive rental and/or compression devices, and Advanced Recovery in particular, through a fraudulent protocol of treatment, all while significantly diminishing the coverage available for medically necessary services, to the extent the Covered Persons were actually injured and in need of treatment.

52. In addition, in furtherance of the fraudulent protocol of treatment, the Retail Defendants, through Advanced Recovery, also routinely submitted fraudulent bills to Plaintiff for Rental DME, DME and/or orthotic devices that were never provided, including, but not limited to, expensive custom-fit orthotic devices.

53. On information and belief, Advanced Recovery was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

54. On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any Rental DME, DME and/or orthotic devices at all, provided Covered Persons with medically unnecessary equipment pursuant to a pre-

determined treatment protocol and/or inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising Covered Persons' health.

55. At all times relevant herein, the Defendants also exploited the No-fault Law through the utilization of various deceptive and identical billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiff, in particular, through the submission of fraudulent billing documents that misrepresented the nature, quality and cost of items that both are and are not listed on the relevant fee schedule ("Fee Schedule items" and "Non-Fee Schedule items," respectively) purportedly provided to Covered Persons.

56. As set forth in the "Fee Schedule Scheme to Defraud" section below, the Retail Defendants, through Advanced Recovery, also routinely submitted fraudulent bills to Plaintiff for (i) expensive DME and/or orthotic devices, such as back braces that were never provided; (ii) expensive DME and/or orthotic devices that required a customized fitting that they never performed; and/or (iii) reimbursement under expensive fee schedule codes for DME and/or orthotic devices that Advanced Recovery never actually provided.

57. In addition, as set forth in the "Non-Fee Schedule Scheme to Defraud" below, the Retail Defendants, through Advanced Recovery, routinely submitted bills to Plaintiff for Non-Fee Schedule items wherein Advanced Recovery misrepresented that (i) the DME and/or orthotic devices purportedly provided were reimbursable under the relevant Fee Schedule in existence at the time, when, in fact, Advanced Recovery was utilizing codes that were not recognized by, or otherwise listed in, the relevant Fee Schedule ("phantom codes"); (ii) the charges reflected on Advanced Recovery's bills were in accordance with 12 N.Y.C.R.R. § 442.2 and/or 11 N.Y.C.R.R. § App.17-C Part E, when, in fact, the charges were grossly inflated; and/or (iii) the DME and/or

orthotic devices purportedly provided were reimbursable pursuant to the Fee Schedule, when they were not. In doing so, the Retail Defendants, as described in the "Non-Fee Schedule Scheme to Defraud" section below, through Advanced Recovery, deliberately misrepresented the amounts that they were entitled to receive under the No-fault Law.

58. On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any Rental DME, DME and/or orthotic devices at all, provided Covered Persons with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health. The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud—although that would be troubling enough—rather, they adopted fraudulent blueprints as their business plans and used them to participate in systematic patterns of racketeering activity. Every facet of Defendants' operations, from securing prescriptions Rental DME, DME and/or orthotic devices pursuant to a predetermined course of treatment, that misrepresented the nature, quality, cost, and medical necessity for the Rental DME purportedly provided, was carried out for the purpose of committing fraud.

59. This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for Rental DME, DME and/or orthotic devices. In doing so, Plaintiff seeks compensatory damages and declaratory relief that Plaintiff is not required to pay any of Retail Defendants' No-fault claims because the Retail

Defendants, through Advanced Recovery, submitted (1) false and fraudulent insurance claims for medically unnecessary Rental DME, DME and/or orthotic devices to Plaintiff deliberately misrepresenting the amounts it was entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiff for DME that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity. Such claims continue to be submitted by and/or in the name of Advanced Recovery and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiff.

60. This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for Rental DME, DME and/or orthotic devices. In doing so, Plaintiff seeks compensatory damages and declaratory relief that Plaintiff is not required to pay any of the Retail Defendants' No-fault claims because the Retail Defendants, through Advanced Recovery, submitted (1) false and fraudulent insurance claims to Plaintiff deliberately misrepresenting the amounts it was entitled to be reimbursed; (2) false and fraudulent insurance claims to Plaintiff for Rental DME, DME and/or orthotic devices the Retail Defendants never actually supplied to Covered Persons; and/or (3) false and fraudulent insurance claims to Plaintiff for DME that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity. Such claims continue to be submitted by and/or in the name of Advanced Recovery and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiff.

61. By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing in excess of $1,700,000.00 in unpaid No-fault claims that form the basis of Plaintiff's request for declaratory relief. Said spreadsheet is grouped by claim number, date of service and the amount billed.

## NATURE OF THE ACTION

62. This action is brought pursuant to:

i) The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii) New York State common law; and

iii) the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

63. Pursuant to 18 U.S.C. § 1964(c), Plaintiff seeks treble damages, which it sustained as a result of the Defendants' schemes to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiff for Rental DME, DME and/or orthotic devices they allegedly provided to individuals covered by Plaintiff under New York State's No-fault Law.

64. Plaintiff further seeks a judgment declaring that it is under no obligation to pay any of Advanced Recovery's unpaid No-fault claims because:

i) The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiff;

ii) The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for Rental DME, DME and/or orthotic devices that they never supplied to Covered Persons; and

iii) The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for DME that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

65. As a result of Defendants' actions alleged herein, Plaintiff was defrauded of an amount in excess of $1,500,000.00 the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiff for Rental DME, DME and/or orthotic devices that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

### A. Plaintiff

66. Plaintiff American Transit Insurance Company is a corporation duly organized and existing under the laws of the State of New York, having its principal place of business in Brooklyn, New York.

67. Plaintiff is duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provides automobile insurance coverage to its policyholders under and in accordance with New York State law.

### B. Retailer Defendant

68. Advanced Recovery Equipment and Supplies ("Advanced Recovery"), was incorporated on or about March 15, 2011, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 1100 Coney Island Avenue, 3rd Floor, Brooklyn, New York 11230.

**C. Individual Defendants**

69. Daniel Horowitz ("Horowitz") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailed Defendant Advanced Recovery Equipment and Supplies LLC, and, at all times relevant herein, operated, managed, and/or controlled their activities.

70. Russel Gladkovitser a/k/a Ruslan Gladkovitser ("Gladkovitser") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Defendant Advanced Recovery Equipment and Supplies LLC, and, at all times relevant herein, operated, managed, and/or controlled their activities.

71. Jay Robinzon ("Robinzon") is a natural person residing in the State of New Jersey, is the principal, officer and/or director of Retailer Defendant Advanced Recovery Equipment and Supplies LLC, and, at all times relevant herein, operated, managed, and/or controlled their activities.

72. Simon Pelman ("Pelman") is a natural person residing in the State of New Jersey, is the principal, officer and/or director of Retailer Defendant Advanced Recovery Equipment and Supplies LLC, and, at all times relevant herein, operated, managed, and/or controlled their activities.

**C. The John Doe Defendants**

73. On information and belief, John Does 1 through 5 are individuals that are unknown to Plaintiff, who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**D. <u>The ABC Corporations</u>**

74. On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiff that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme. These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

75. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

76. This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

77. This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

78. Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

79. Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

80. Plaintiff underwrites automobile insurance in New York State and participate as insurers in New York State's No-fault program.

81. As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiff is required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

82. Advanced Recovery is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law. In exchange for its services, Advanced Recovery accepts assignments of benefits from Covered Persons covered under the No-Fault Law and submits claims for payment to No-fault insurance carriers, in general, and to Plaintiff, in particular.

83. To process and verify the claims submitted by Advanced Recovery, Plaintiff required, and Advanced Recovery submitted, prescriptions and other documents relating to the Rental DME, DME and/or orthotic devices allegedly supplied to Covered Persons for which Advanced Recovery was seeking reimbursement from Plaintiff.

84. In nearly all instances, the prescriptions submitted in support of Advanced Recovery's claims for reimbursement were fraudulent, fabricated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

85. At all relevant times mentioned herein, in each bill submission to No-fault insurers in general, and Plaintiff in particular, Advanced Recovery made the following representations to each recipient:

- The bill for Rental DME, DME and/or orthotic devices was based on a valid prescription by a healthcare practitioner licensed to issue such prescriptions;
- The prescription for Rental DME, DME and/or orthotic device(s) was not issued pursuant to any unlawful financial arrangements;
- The Rental DME, DME and/or orthotic device(s) identified on the bill was actually provided to the Covered person based on a valid prescription identifying medically necessary items;
- The billing code used on the bill actually represents the DME and/or orthotic device(s) and all included services that was provided to the Covered Person; and
- The fee sought for the billed for Rental DME, DME and/or orthotic device(s) did not exceed that permissible under the No-fault law and regulations.

86. Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiff is required to promptly process Advanced Recovery's claims within 30 days of receipt of proof of claim.

87. To fulfill its obligation to promptly process claims, Plaintiff justifiably relied upon the bills and documentation submitted by Advanced Recovery in support of its claims, and paid Advanced Recovery based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiff.

88. At all relevant times mentioned herein, the No-fault Law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

89. At all relevant times mentioned herein, for DME and orthotic devices provided to Covered Persons prior to April 4, 2022, the Worker's Compensation Board has adopted the fee

schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2 (effective through June 7, 2021).

90. At all relevant times mentioned herein prior to April 4, 2022, with respect to DME and/or medical supplies for which the New York State Medicaid program had not established a fee ("Non-Medicaid DME Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

> (1) the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or
>
> (2) the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2 (effective through June 7, 2021).

91. At all relevant times mentioned herein prior to April 4, 2022, the regulation provides that suppliers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule." 12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

92. Furthermore, at all relevant times mentioned herein prior to April 4, 2022, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or

additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

93. At all relevant times mentioned herein prior to April 4, 2022, the total monthly rental charge for equipment, supplies and services billed under codes listed in the Fee Schedule is ten percent (10%) of the listed maximum reimbursement amount.

94. At all relevant times mentioned herein prior to April 4, 2022, for DME billed under HCPCS codes that are recognized under the Fee Schedule, but do not contain a maximum reimbursement amount, the maximum charge for a monthly rental is ten percent (10%) of the acquisition cost for the DME, which includes all supplies that are provided with the DME rental. *See Government Employees Insurance Company v. MiiSupply LLC,* Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019).

95. As a result of the WCB's delay of implementation of amendments to 12 N.Y.C.R.R. § 442.2, intended to become effective June 7, 2021, the fee schedule set by the New York State Medicaid Program and adopted by the WCB, and the Lesser of Standard continued to set the maximum permissible charge for DME and/or orthotic devices dispensed through April 3, 2022. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021), 046-1496 (Feb. 3, 2022).

96. On April 4, 2022, the WCB's amendments to 12 N.Y.C.R.R. § 442.2 took effect, including the establishment of the WCB DME Fee. As part of the WCB's establishment of the WCB DME Fee Schedule, the available DME on the Fee Schedule was updated, the reimbursement rates were increased, and a prior authorization process was established for certain DME in the WCB DME Fee Schedule for which no reimbursement rate is listed and/or for DME

not listed in the WCB DME Fee Schedule. As a result of these amendments, the WCB eliminated the prior Lesser of Standard that had existed for Non-Fee Schedule items.

97. Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided on or after April 4, 2022, the Worker's Compensation Board has adopted its own fee schedule for DME and orthotic devices to replace its prior adoption, of the fee schedule set by the New York State Medicaid Program. 12 N.Y.C.R.R. § 442.2. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021), 046-1496 (Feb. 3, 2022).

98. At all times mentioned herein on or after April 4, 2022, for the WCB Fee Schedule rental DME, the fee payable shall be:

> The maximum permissible monthly charge for the rental of durable medical equipment shall be the rental price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule multiplied by the total number of months or weeks respectively for which the durable medical equipment is needed. In the event the total rental charge exceeds the purchase price, the maximum permissible charge for the durable medical equipment shall be the purchase price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule, whether or not the claimant keeps the durable medical equipment or returns it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

99. In view of the WCB's elimination of the Lesser of Standard, resulting in the absence of a cost control measure for Non-WCB DME Fee Schedule items and the potential for exorbitant prices and unlimited rental charges that could far exceed the purchase price of the DME, the DFS Superintendent deemed it necessary to adopt an emergency amendment to 11 N.Y.C.R.R. § 68 (Regulation 83) to cap the purchase prices and the total accumulated rental prices for Non-WCB Fee Schedule items.

100. Accordingly, at all relevant times mentioned herein on or after April 4, 2022, for Non-WCB Fee Schedule DME, the maximum permissible purchase charge remained "the lesser

of the: (1) acquisition cost plus 50%; or (2) usual and customary price charged by durable medical equipment providers to the general public." 11 N.Y.C.R.R. § App.17-C Part E(c); 11 N.Y.C.R.R. § App.17-C Part E(c) (promulgated by April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022 Notices of Emergency Adoption); *accord* 11 N.Y.C.R.R. § App.17-C Part E(c), (d)(2). (Final Adoption effective February 15, 2023). Moreover, at all relevant times mentioned herein on or after June 1, 2023, for the rental of DME either not listed on the WCB Fee Schedule, or listed without a maximum permissible rental charge, the "maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth of the acquisition cost to the provider. Rental Charges for less than one month shall be calculated on a pro-rata basis using a 30-day month." 11 N.Y.C.R.R. § App.17-C Part E(d)(1) (Final Adoption effective February 15, 2023). As used in the regulation, "acquisition cost means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax." 11 N.Y.C.R.R. § App.17-C Part E (b) (promulgated by Notices of Emergency Adoption issued April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022, and Final Adoption effective February 15, 2023).

101. Advanced Recovery was created as the centerpiece of an elaborate scheme to fraudulently bill No-fault insurance carriers for Rental DME, DME and/or orthotic devices that were never provided, were not provided as billed or, if provided, were either of inferior quality relative to what was included in the bills submitted to Plaintiff, and/or were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Covered Persons received the same or similar battery of Rental DME, DME and/or orthotic devices.

102. The Rental DME, DME and/or orthotic devices that Advanced Recovery purported to provide, and for which it billed Plaintiff, seldom varied from Covered Person-to-Covered Person over a given period of time and also did not change based on any differences in the Covered Persons' condition, age, complaints, type of accident, or nature of alleged injury. Instead, the Retail Defendants, through Advanced Recovery, created a billing apparatus implementing a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

103. The Retail Defendants created and controlled Advanced Recovery, as part of a well-organized illegal enterprise that engaged in systematic and pervasive fraudulent practices that distinguished it from legitimate providers of Rental DME, DME and/or orthotic devices. The components of the enterprise followed practices that were part of a racketeering scheme dictated by the Retail Defendants, including, but not limited to, the one of more of the following practices:

- Unlike legitimate retail DME companies, the Retail Defendants, through Advanced Recovery, misrepresented the nature, quality, and cost of Rental DME, DME and/or orthotic devices purportedly provided to Covered Persons;
- Unlike legitimate retail DME companies, the Retail Defendants, through Advanced Recovery, submitted bills to Plaintiff misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;
- Unlike legitimate retail DME companies, the Retail Defendants, through Advanced Recovery, submitted bills to Plaintiff for Rental DME, DME and/or orthotic devices that were never provided to Covered Persons;
- Unlike legitimate retail DME companies, the Retail Defendants, through Advanced Recovery, misrepresented the acquisition costs and/or usual and customary price of the Non-fee Schedule items purportedly supplied to Covered Persons;
- Unlike legitimate retail DME companies, the Retail Defendants, through Advanced Recovery, submitted bills to Plaintiff reflecting prices far in excess of those actually paid, concealing that the items actually supplied

were far less expensive than the amounts indicated in the bills for any particular item;

- Unlike legitimate retail DME companies, the Retail Defendants, through Advanced Recovery, submitted prescriptions, bills, and delivery receipts to Plaintiff for Rental DME, DME and/or orthotic devices that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided;
- Unlike legitimate retail DME companies, the Retail Defendants, through Advanced Recovery, concealed the fact that the Rental DME, DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;
- Unlike legitimate retail DME companies, the Retail Defendants, through Advanced Recovery, concealed the fact that the prescription forms submitted in support of their claims for reimbursement were issued in order to maximize reimbursement regardless of medical necessity;
- Unlike legitimate retail DME companies, the Retail Defendants, through Advanced Recovery and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics;
- Unlike legitimate retail DME companies, the Retail Defendants, through Advanced Recovery, arranged for the generic language on the prescription forms in order to unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Plaintiff in particular;
- Unlike legitimate retail DME companies, the Retail Defendants, through Advanced Recovery, arranged to have prescriptions for Rental DME, DME and/or orthotic devices delivered to them directly by the No-fault Clinics, rather than allowing the Covered Persons to select their own DME retailers; and/or
- Unlike legitimate retail DME companies, the Retail Defendants, through Advanced Recovery, entered into illicit relationships with the No-fault Clinic, which, in exchange for kickbacks and/or a fee, provided Advanced Recovery with prescriptions and/or referrals for Rental DME, DME and/or orthotic devices pursuant to a predetermined course of treatment, irrespective of medical necessity.

104. In these and numerous other ways, Defendants sought to deceive Plaintiff into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

105. The members of the Advanced Recovery enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the

enterprises. By way of example and not limitation, in furtherance of their scheme to defraud, Advanced Recovery engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to ensure that their HCPs prescribed large amounts of virtually identical Rental DME, DME and/or orthotic devices to their patient population;
- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that the nature, quality, and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone;
- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that Advanced Recovery could unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Plaintiff in particular;
- Submitted or caused to be submitted, on behalf of Advanced Recovery, numerous fraudulent claim forms seeking payment for Rental DME, DME and/or orthotic devices that were purportedly (but not actually) provided to many Covered Persons;
- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiff; and/or
- Mailed or caused those acting under their direction to mail bogus claims to Plaintiff, knowing that they contained materially false and misleading information.

106. At all relevant times mentioned herein, the Retail Defendants knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary DME.

107. At all relevant times mentioned herein, the Retail Defendants, through Advanced Recovery, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and claim forms in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

108. At all relevant times mentioned herein, the Retail Defendants and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiff, in particular, of money.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

109. Beginning in June 2012 and continuing until the present day, Defendants and others not named in the Complaint have engaged in systematic fraudulent billing schemes based upon the alleged provision of Rental DME, DME and/or orthotic devices to Covered Persons.

110. The Retail Defendants incorporated, owned and/or controlled Advanced Recovery for the purpose of defrauding insurers, in general, and Plaintiff, in particular.

111. Furthermore, the Retail Defendants have a history of engaging in No-fault billing fraud schemes involving Rental DME, DME and/or orthotic devices. Indeed, in 2022, Horowitz was sued for allegedly engaging in a multimillion-dollar fraudulent DME billing scheme through his DME company, Advanced Recovery. The scheme involved, among other things, dispensing expensive, medically unnecessary Rental DME, DME and/or orthotic devices, including, similar to the instant scheme, CPMs, CTUs, and other orthotics, pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements with various prescribing healthcare providers and No-fault clinics with no regard to genuine patient care. *See, e.g., Allstate Ins. Co., et al, v. Advanced Recovery Equipment and Supplies LLC, et al,* 22-cv-05232 (HG)(E.D.N.Y. 2022).

112. Moreover, in 2024, Defendants Horowitz, Robinzon, and Gladkovitser were sued for allegedly engaging in a similar fraudulent DME billing scheme, also through Advanced

Recovery. *See, e.g., Liberty Ins. Co., et al, v. Advanced Recovery Equipment and Supplies LLC, et al*, 24-cv-02518 (DG)(JRC)(E.D.N.Y. 2024).

113. The Retail Defendants, through Advanced Recovery, engaged in a scheme to defraud, wherein Retail Defendants: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of Rental DME, DME and/or orthotic devices; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiff, in particular, prescriptions which they knew to be intentionally generic in order to misrepresent the number and/or quality of DME and/or orthotic devices actually prescribed; (iv) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiff, in particular; and (v) systematically submitted bills to insurers, in general, and Plaintiff, in particular, for Rental DME, DME and/or orthotic devices that were purportedly provided to Covered Persons based on medical necessity when, in fact, Retail Defendants, through Advanced Recovery, determined the DME that would be prescribed by the No-fault Clinics, with virtually every Covered Person receiving a substantially similar battery of Rental DME, DME and/or orthotic devices.

114. In fact, on information and belief, a vast majority of the billing that Advanced Recovery submitted to Plaintiff for reimbursement of Rental DME and/or orthotics dispensed, if at all, to No-fault Claims came from a few prescribing physicians and/or practices, with a history of engaging in No-fault billing schemes.

115. By way of example but not limitation, numerous fraudulent prescriptions submitted in claims for reimbursements from Advanced Recovery to Plaintiff were issued by medical

providers that purportedly provided services through Brooklyn Premier Orthopedics ("Brooklyn Premier Orthopedics"), a professional corporation in which Raz Winiarsky ("Winiarsky") is listed as the record owner and which operates out of several locations throughout the New York metropolitan area. Winiarsky, together with multiple entities he has been associated with, including Brooklyn Premier Orthopedics, have been sued by multiple No-fault insurance carriers for allegedly engaging in pervasive racketeering and billing fraud schemes involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements. *See Allstate Ins. Co., et al, v. Advanced Recovery Equipment and Supplies LLC, et al,* 22-cv-05232 (HG)(E.D.N.Y. 2022); *Roosevelt Road Re, LTD., et al, v. Liakas Law, P.C., et al,*25-cv-00300 (RML)(E.D.N.Y.).

116. By way of further example but not limitation, numerous fraudulent prescriptions submitted in claims for reimbursements from Advanced Recovery to Plaintiff were issued by medical providers that purportedly provided services through Richard M. Seldes, M.D., P.C. ("Richard M. Seldes PC"), a professional corporation in which Richard Seldes ("Seldes") is listed as the record owner and which operates out of 95-25 Queens Boulevard, 1st Floor, Rego Park, New York 11374. Seldes, together with multiple entities he has been associated with, including Richard M. Seldes PC, have been sued by multiple No-fault insurance carriers for allegedly engaging in pervasive racketeering and billing fraud schemes involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements. *See American Transit Ins. Co., et al, v. All City Family Healthcare Center Inc., et al,* 24-cv-08606 (JRC)(E.D.N.Y.); *Allstate Ins. Co., et al, v. Melgar, P.T., et al,* 22-cv-07634 (E.D.N.Y.); *Allstate Ins. Co., et al, v. Walter E. Mendoza, D.C., et al,* 18-cv-04361 (E.D.N.Y.).

117. By way of further example but not limitation, numerous fraudulent prescriptions submitted in claims for reimbursements from Advanced Recovery to Plaintiff were issued by medical providers that purportedly provided services through LR Medical, PLLC, a professional corporation in which Leonid Reyfman a/k/a Leon Reyfman ("Reyfman") is listed as the record owner and which operates out of several locations throughout the New York metropolitan area. Reyfman and several of his professional corporations in which he is listed as the record owner, including LR Medical, PLLC, have been sued by multiple No-fault insurance carriers for allegedly engaging in a multimillion-dollar fraud scheme involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements. *See Liberty Mut. Ins. Co., et al, v. Woodside Chemists, Inc., et al,* 17-cv-06313 (ILG)(CLP)(E.D.N.Y.); *Allstate Ins. Co., et al, v. Michael Chillemi Jr., et al,* 19-cv-03051 (ERK)(VMS)(E.D.N.Y.); *Uber Technologies, Inc. v. Wingate, Russotti, Shapiro, Moses & Halperin, LLP, et al,* cv-25-00522 (VMS)(E.D.N.Y.); *Roosevelt Road Re, LTD., et al, v. Wingate, Rusotti, Shapiro, Moses & Halperin, LLP, et al,*24-cv-06259 (E.D.N.Y.); *Union Mut. Fire Ins. Co., v. Liakas Law, P.C., et al,* 25cv-01857 (E.D.N.Y.); *Roosevelt Road Re, LTD., et al, v. Liakas Law, P.C., et al,*25-cv-00300 (RML)(E.D.N.Y.).

118. By way of further example but not limitation, numerous fraudulent prescriptions submitted in claims for reimbursements from Advanced Recovery to Plaintiff were issued by medical providers that purportedly provided services through B.L. Pain Management, P.L.L.C. ("BL Pain Management"), a professional corporation in which Boleslav Kosharskyy ("Kosharskyy") is listed as the record owner and which operates out of several locations throughout the New York metropolitan area. Kosharskyy and several of his professional corporations in which he is listed as the record owner, including BL Pain Management, have been

sued by multiple No-fault insurance carriers for allegedly engaging in a multimillion-dollar fraud scheme involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements. *See Roosevelt Road Re, LTD., et al, v. Liakas Law, P.C., et al,*25-cv-00300 (RML)(E.D.N.Y.); *Roosevelt Road Re, LTD., et al, v. Wingate, Rusotti, Shapiro, Moses & Halperin, LLP, et al,*24-cv-06259 (E.D.N.Y.); *Union Mut. Fire Ins. Co., v. Liakas Law, P.C., et al,* 25cv-01857 (E.D.N.Y.).

119. With Advanced Recovery in place, Defendants carried out their scheme to fraudulently bill insurers, in general, and Plaintiff, in particular, for expensive Rental DME, DME and/or orthotic devices that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, and further, were inexpensive items of inferior quality that cost a fraction of the amounts that Defendants materially misrepresented in their fraudulent bill submissions to Plaintiff.

120. Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements with Advanced Recovery, would issue a prescription for a standard battery of Rental DME, DME and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary.

121. Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

122. As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with Advanced Recovery, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to Advanced Recovery by: (i) causing their Health Care Practitioners ("HCPs") to write DME prescriptions in accordance with a pre-determined protocol; (ii) ensuring that the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone; and/or (iii) ensuring that the prescriptions were provided directly to Advanced Recovery to ensure that Advanced Recovery could bill Plaintiff to purportedly fill the prescription rather than allow the possibility that the Covered Person may fill the prescription at a DME retailer of their own choosing.

123. In numerous instances, not only did Covered Persons receive the same or similar battery of Rental DME, DME and/or orthotic devices, but oftentimes two or more Covered Persons that were purportedly injured in the same accident would receive identical or virtually identical prescriptions for Rental DME, DME and/or orthotic devices despite being different ages, in different physical condition, differently positioned in the same motor vehicle accident, and possessing differing medical needs.

124. On information and belief, it is improbable that two or more Covered Persons in the same motor vehicle accident would suffer substantially similar injuries, be in similar physical health and/or have similar symptoms that would require identical or virtually identical Rental DME, DME and/or orthotic devices, let alone multiple Covered Persons.

125. In furtherance of the scheme to defraud alleged herein, pursuant to the fraudulent protocol of treatment, the HCPs at the No-fault Clinics routinely prescribed identical Rental DME,

DME and/or orthotic devices to two or more Covered Persons who were involved in the same accident. By way of example and not limitation:

- On June 27, 2019, Covered Persons J.E., claim no. 1063246-01, and H.F., claim no. 1063246-04 were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet purportedly received the same Rental DME, DME and/or orthotic devices from Defendant Advanced Recovery despite their injuries being almost certainly different:

| Covered Person | Dates of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| J.E. | 10/16/20-11/26/20 | 1. Water Circulating Cold Pad with Pump | E0218 | $1,512.00 |
| | 10/16/20 | 2. Pad for Water Circulating Heat Unit | E0249 | $37.50 |
| H.F. | 3/28/21-5/8/21 | 1. Water Circulating Cold Pad with Pump | E0218 | $1.512.00 |
| | 3/28/21 | 2. Pad for Water Circulating Heat Unit | E0249 | $37.50 |

- On March 11, 2020, Covered Persons M.G., claim no. 1082609-02, C.M., and M.M., claim no. 1082609-04 were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet received virtually the same Rental DME, DME and/or orthotic devices from Defendant Advanced Recovery despite their injuries being almost certainly different:

| Covered Person | Dates of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| M.G. | 9/10/20-10/8/20 | 1. CPM for use other than Knee | E0936 | $3,570.00 |
| | | 2. Water Circulating Cold Pad with Pump | E0218 | $1,512.00 |
| | 9/10/20 | 3. Pad for Water Circulating Heat Unit | E0249 | $37.50 |
| M.M. | 9/10/20 - 10/8/20 | 1. CPM for use other than Knee | E0936 | $3,570.00 |
| | | 2. Water Circulating Cold Pad with Pump | E0218 | $1,512.00 |
| | 9/10/20 | 3. Pad for Water Circulating Heat Unit | E0249 | $37.50 |

- On June 15, 2019, Covered Persons A.A., claim no. 783066-03, and M.C., claim no. 783066-05 were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet received virtually the same Rental DME, DME and/or orthotic devices from Defendant Advanced Recovery despite their injuries being almost certainly different:

| Covered Person | Dates of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| A.A. | 12/24/15-2/3/16 | 1. Water Circulating Cold Pad with Pump | E0218 | $1,512.00 |
| | | 2. CPM for use other than Knee | E0936 | $3,570.00 |
| | 12/14/15 | 3. Pad for Water Circulating Heat Unit | E0249 | $37.50 |
| | 10/22/15 | 4. LSO | L0631 | $806.64 |
| M.C. | 4/16/16-5/27/16 | 1. Water Circulating Cold Pad with Pump | E0218 | $1,512.00 |
| | | 2. CPM for use other than Knee | E0936 | $3,570.00 |
| | 4/16/16 | 3. Pad for Water Circulating Heat Unit | E0249 | $37.50 |
| | 9/24/15 | 4. LSO | L0631 | $806.64 |

- On March 12, 2016, Covered Persons T.L., claim no. 665944-03, M.D., claim no. 665944-06, R.L., claim no. 665944-09 were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet purportedly received virtually the same Rental DME, DME and/or orthotic devices from Defendant Advanced Recovery despite their injuries being almost certainly different:

| Covered Person | Dates of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| T.L. | 4/8/16 | 1. Conductive Paste or Gel | A4558 | $45.00 |
| | | 2. Application of Surface | 64550 | $73.29 |
| | | 3. LSO | L0631 | $806.64 |
| M.D. | 4/8/16 | 1. Conductive Paste or Gel | E0184 | $45.00 |
| | | 2. Application of Surface | E0199 | $73.29 |
| | | 3. Tens Unit | L0180 | $76.25 |
| | | 4. LSO | L0631 | $806.64 |
| R.L. | 4/11/16 | 1. LSO | L0631 | $806.64 |
| | 10/19/16 | 2. Conductive Paste or Gel | A4558 | $45.00 |
| | | 3. Application of Surface | 64550 | $73.29 |
| | | 4. Tens Unit | L0180 | $76.25 |

- On October 27, 2017, Covered Persons J.L.D., claim no. 1010351-01, and N.R.K., claim no. 1010351-02 were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet purportedly received the same Rental DME, DME and/or orthotic devices from Defendant Advanced Recovery despite their injuries being almost certainly different:

| Covered Person | Dates of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| J.L.D. | 12/4/17 | 1. Cervical Traction Equipment | E0855 | $1,407.28 |
| | | 2. Conductive Paste or Gel | A4558 | $45.00 |
| | | 3. Application of Surface | 64550 | $73.29 |
| | | 4. TENS Unit | E0730 | $76.25 |
| | | 5. LSO | L0638 | $708.65 |
| | 12/4/17-1/14/18 | 6. Cervical Traction Equipment | E0855 | $703.64 |
| N.R.K. | 12/4/17 | 1. Cervical Traction Equipment | E0855 | $1,407.28 |
| | | 2. Conductive Paste or Gel | A4558 | $45.00 |
| | | 3. Application of Surface | 64550 | $73.29 |
| | | 4. TENS Unit | E0730 | $76.25 |
| | | 5. LSO | L0638 | $708.65 |
| | 1/14/18 | 6. Cervical Traction Equipment | E0855 | $703.64 |

- On January 10, 2018, Covered Persons C.M.A., claim no. 1015908-01 and J.Z., claim no. 1015908-02 were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet received the same Rental DME, DME and/or orthotic devices from Defendant Advanced Recovery despite their injuries being almost certainly different:

| Covered Person | Dates of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| C.M.A | 1/18/18-5/17/18 | 1. Cervical Traction Equipment | E0855 | $6,031.20 |
| | 1/18/18 | 2. Conductive Paste | A4558 | $45.00 |
| | | 3. Application of Surface Neurostimulator | 64550 | $73.29 |
| | | 4. TENS Unit | E0730 | $76.25 |
| | | 5. LSO | L0648 | $708.65 |
| J.Z. | 1/18/18-5/17/18 | 1. Cervical Traction Equipment | E0855 | $6,031.20 |
| | 1/18/18 | 2. Conductive Paste | A4558 | $45.00 |
| | | 3. Application of Surface Neurostimulator | 64550 | $73.29 |
| | | 4. TENS Unit | E0730 | $76.25 |
| | | 5. LSO | L0748 | $708.65 |

126. In furtherance of the predetermined fraudulent protocol of treatment, in numerous instances, the Rental DME, DME and/or orthotic devices prescribed were not documented in the

initial examination report or a follow-up examination report of the HCP at the No-fault Clinics where the Covered Persons were treated. To the extent that any of the medical records did identify the Rental DME, DME and/or orthotic devices purportedly prescribed, the records did not explain the medical necessity for the Rental DME, DME and/or orthotic devices, did not identity or reference all of the Rental DME, DME and/or orthotic devices listed on the prescriptions, and in some instances, identified Rental DME, DME and/or orthotic devices that was not included on the prescription issued by the HCPs. In addition, on many occasions, the prescriptions for Rental DME, DME and/or orthotic devices purportedly issued by the HCPs were often issued on dates that the Covered Persons did not treat with the HCPs. By way of example and not limitation:

- On September 30, 2024, Covered Person S.B.M., claim no. 1142613-02 purportedly presented for a left should arthroscopy at New Horizon Surgical Center, an ambulatory surgical center located at 680 Broadway, Suite 201, Paterson, NJ 07514 yet the record of operative report nor any follow-up reports made no mention of any prescription or recommendation for Rental DME, DME and/or orthotic devices. Notwithstanding, Advanced Recovery submitted a bill pursuant to a prescription issued by Richard Seldes, M.D. (not named as a Defendant in the Complaint) dated September 30, 20204, from Richard Seldes, M.D. PC prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| S.B.M. | 9/30/24 | 1. CPM for use Other Than Knee | E0936 | $436.66 |
| | | 2. CTU | E0236 | $325.08 |
| | | 3. Intermittent Limb Compression Device | E0676 | $1,070.33 |

- On January 12, 2021, Covered Person A.W., claim no. 1091770-02 purportedly presented for a right knee arthroscopy at Bergenfield Surgical Center, an ambulatory surgical center located at 1 North Washington Ave, Suite A, Bergenfield, NJ 07621 yet the operative report nor any follow-up reports made no mention of any prescription or recommendation for Rental DME. Notwithstanding, Advanced Recovery submitted a bill pursuant to a prescription issued by Raz Winiarsky, M.D. (not named as a Defendant in the Complaint) dated January 12, 2021, from FJ Orthopaedics & Pain Management PLLC prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| A.W. | 1/12/21 | 1. CPM for use on Knee | E0935 | $2,100.00 |
| | | 2. CTU | E0218 | $1,008.00 |

- On January 28, 2019, Covered Person S.A.K., claim no. 1046568-01 purportedly presented for an initial chiropractic examination at Century Central Chiropractic, PLLC (not named as a Defendant in the Complaint), a No-fault Clinic located at 369 E. 149th St, 9th Floor, Bronx, NY 10455, yet the initial examination report nor any follow-up reports made no mention of any prescription or recommendation for DME and/or orthotic devices. Notwithstanding, Advanced Recovery submitted a bill pursuant to prescriptions issued by Thomas Miceli, D.C. (not named as a Defendant in the Complaint) dated January 28, 2019, from the same No-fault Clinic prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| S.A.K. | 1/28/19 | 1. Tens Unit | E0730 | $76.25 |
| | | 2. Lumbar Orthosis | L0627 | $322.98 |

- On August 13, 2024, Covered Person S.T., claim no. 1151296-03 purportedly presented for an initial examination at LR Medical, PLLC (not named as a Defendant in the Complaint), a No-fault Clinic located at 1767 68th St, Apt F1, Brooklyn, NY 11204, yet the initial examination report nor any follow-up reports made no mention of any prescription or recommendation for DME and/or orthotic devices. Notwithstanding, Advanced Recovery submitted a bill pursuant to prescriptions issued by Leon Reyfman, MD (not named as a Defendant in the Complaint) dated October 7, 2020, from the same No-fault Clinic prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| S.T. | 10/7/24 | 1. LSO | L0631 | $806.64 |
| | | 2. CTU | E0236 | $325.08 |
| | | 3. Lumbar Seat | T5001 | $756.03 |

- On January 12, 2024, Covered Person J.H., claim no. 1130591-02 purportedly presented for an initial examination at LR Medical, PLLC (not named as a Defendant in the Complaint), a No-fault Clinic located at 153-30 89th Avenue, Jamaica, NY 11432, yet the initial examination report nor any follow-up reports made no mention of any prescription or recommendation for DME and/or orthotic devices. Notwithstanding, Advanced Recovery submitted a bill pursuant to prescriptions issued by Leon Reyfman, MD (not named as a

Defendant in the Complaint) dated February 26, 2024, from the same No-fault Clinic prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| J.H. | 2/26/24 | 1. LSO | L0648 | $708.65 |
| | | 2. CTU | E0236 | $325.08 |
| | | 3. Lumbar Seat | T5001 | $756.03 |

127. In furtherance of the fraudulent protocol of treatment, the specific Rental DME, DME and/or orthotic devices prescribed often contradicted the purported treatment plan of the HCPs.

128. By way of example and not limitation, several Covered Persons were prescribed DME and/or orthotic devices that were designed to decrease and/or restrict the Covered Persons' mobility such as custom fitted LSO. At the same time, the HCPs, were also prescribed physical therapy treatments designed to increase the Covered Persons' mobility. Representative claims where Covered Persons were provided with DME and/or orthotic device prescription designed to decrease mobility, while at the same time were actively receiving physical therapy treatments designed to promote mobility include: S.T., 1151296-03; S.C.M.S., 1084335-02; J.G., 1153942-01; D.P., 1023203-04.

129. On information and belief, the DME and/or orthotic devices restricting the Covered Persons movement completely contravenes the physical therapy treatments that the Covered Persons were also prescribed.

130. In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for Rental DME, DME and/or orthotic devices. Instead, these prescriptions were given directly to Advanced Recovery to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of Rental DME, DME and/or orthotic devices.

131. In addition to arranging for fraudulent prescriptions, in exchange for kickbacks and/or other financial compensation agreements with Advanced Recovery, one or more No-fault Clinics operating in the New York metropolitan area often directed their HCPs to prescribe DME and/or orthotic devices that are not included in the Fee Schedule, such as cushions and lumbar seats; and ensured that the prescriptions issued were generic and non-descript, omitting any detailed description of the items to be supplied to the Covered Persons.

132. Similarly, as part of the kickback and/or other financial compensation agreements with the No-fault Clinics, the No-fault Clinics routinely provided Advanced Recovery with generic, non-descript prescriptions for certain Fee Schedule Items, such as back braces, knee braces, shoulder braces, ankle braces, cervical traction units, cervical collars, and lumbar cushions, which Advanced Recovery then used to unilaterally determine the DME provided to Covered Persons in purported fulfillment of the generic prescriptions, in order to bill for the most expensive type of DME and/or orthotic device and maximize reimbursement from insurers, in general, and Plaintiff, in particular.

133. By submitting a generic, non-descript prescription, devoid of any detail, in support of their claims for reimbursement, Advanced Recovery was provided the means through which they misrepresented the nature, quality and cost of the DME and/or orthotic devices allegedly prescribed and provided to Covered Persons.

134. Furthermore, as part of the kickback or other financial compensation agreements with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

135. In every instance, in furtherance of the scheme to defraud alleged herein, the delivery receipts describe the Rental DME, DME and/or orthotic devices in the same generic, non-descript manner as the prescriptions, and claim forms submitted by Advanced Recovery in support of its claims for reimbursement.

136. In furtherance of the scheme to defraud alleged herein, the delivery receipts submitted by Advanced Recovery to Plaintiff routinely misrepresented the Rental DME, DME and/or orthotic devices provided.

137. On information and belief, in furtherance of the scheme to defraud alleged herein, the Retail Defendants, through Advanced Recovery, often purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, Advanced Recovery knew that they could purchase the counterfeit items at a fraction of the cost of the actual, trademarked items.

138. In furtherance of the scheme to defraud alleged herein, Advanced Recovery purchased the cheap DME and/or orthotic devices in bulk and routinely misrepresented the nature, quality, and cost of the items in order to fraudulently obtain and maximize their reimbursement far in excess of the amounts they were entitled to receive under the No-fault Law.

139. In furtherance of the scheme to defraud alleged herein, Advanced Recovery routinely submitted fraudulent documents, including, but not limited to, claim forms, prescriptions, and delivery receipts, that materially misrepresented the nature, quality, and cost of the DME and/or orthotic devices purportedly provided to Covered Persons.

140. In furtherance of the scheme to defraud alleged herein, Advanced Recovery routinely submitted fraudulent bills seeking the maximum possible amount of reimbursement

under the No-fault Law for expensive DME and/or orthotic devices that were never actually provided or not provided as billed and/or, if provided, provided pursuant to a predetermined course of treatment, without regard to medical necessity.

141. In many cases, Advanced Recovery never actually provided the DME for which it billed Plaintiff.

142. In furtherance of the scheme to defraud alleged herein, Advanced Recovery's bills intentionally omitted the make, model, and manufacturer of the DME and/or orthotic devices purportedly provided to Covered Persons in order to conceal the fact that the DME and/or orthotic devices purportedly provided were inexpensive and of poor quality, to the extent they were provided at all.

143. By way of example and not limitation, and as set forth in the "Non-Fee Schedule Scheme to Defraud" section below, Retail Defendants, through Advanced Recovery, routinely submitted bills to Plaintiff for Non-Fee Schedule items wherein Advanced Recovery misrepresented that: (i) certain DME and/or orthotic devices were reimbursable under the relevant Fee Schedule in existence at the time when, in fact, Advanced Recovery was utilizing phantom codes for which there was no published fee schedule; (ii) the charges reflected on Advanced Recovery's bills for Non-Fee Schedule items were the lesser of their acquisition costs or the usual and customary prices charged to the general public; and/or (iii) the Fee Schedule codes and descriptions contained in Advanced Recovery's bills corresponded with the equipment purportedly provided.

144. In addition, as set forth in the "Fee Schedule Scheme to Defraud" section below, the Retail Defendants, through Advanced Recovery, routinely submitted fraudulent bills to Plaintiff; (i) in support of expensive DME and/or orthotic devices that required a customized fitting

that they never performed; and/or (ii) which sought reimbursement rates under expensive fee schedule codes for DME and/or orthotic devices that Advanced Recovery never actually provided.

145. In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiff, virtually every bill submitted by Advanced Recovery deliberately obscured all identifying information relating to the billed-for DME and/or orthotic devices so as to prevent Plaintiff from determining the appropriate charges associated with any such DME and/or orthotic device or whether the specific DME and/or orthotic device was medically necessary.

146. In furtherance of the scheme to defraud alleged herein, the Retail Defendants, through Advanced Recovery, routinely submitted fraudulent bills in support of expensive DME and/or orthotic devices that required a custom fitting and/or adjustment which they never performed. By way of example and not limitation, Exhibit “3” in the accompanying Compendium of Exhibits is a representative sample of claims in which the Retail Defendants, through Advanced Recovery, billed for expensive supports and/or braces that required fittings and adjustments which they never performed.

147. Defendants’ activity promoted and facilitated other acts that imposed costs onto Plaintiff well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiff’s expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys’ and court reporting fees, independent medical examinations (“IMEs”), and peer reviews.

## FRAUDULENT BILLING OF RENTAL DME ITEMS

148. In furtherance of the scheme to defraud alleged herein, Advanced Recovery, as a matter of pattern, practice, and protocol, routinely billed insurers, in general, and Plaintiff in particular, for expensive Rental DME in connection with the Covered Persons’ treatment that were

medically unnecessary and billed for, on information and belief, as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

149. As part of the scheme, the Covered Persons purportedly receiving the expensive Rental DME items were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment. Shortly after the accident, the Covered Persons are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture, and several pieces of Rental DME, DME and/or orthotic devices including expensive Rental DME—in some instances, receiving up to ten (10) or more items.

150. At the same time and/or shortly after Covered Persons purportedly receive several pieces of DME and/or orthotic devices, as part of the fraudulent protocol of treatment, the Covered Persons are prescribed a round of expensive pain management Rental DME and/or compression devices by the HCPs operating out of the No-fault Clinics, including the Rental DME billed for and purportedly dispensed by Advanced Recovery.

151. Moreover, months after the accident, as part of the fraudulent protocol of treatment, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey. These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

152. On the same day as the surgery, and within a few short days after the surgery, the Covered Persons are prescribed additional expensive perioperative and/or postoperative rental DME and/or compression devices, as part of a pattern and protocol of treatment to maximize

reimbursement for items that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration. In many cases, the Covered Persons receive at least four or more such items, for up to 28 days or longer, in some cases exceeding $10,000.00 in a total cost for all of the perioperative and postoperative items. By way of example and not limitation, the following are non-exhaustive examples where Covered Persons received the same or similar battery of perioperative and/or postoperative rental DME and/or compression devices, including Compression Devices purportedly provided by Advanced Recovery and one or more additional Compression Devices purportedly provided by other DME retailers:

- In connection with claims submitted on behalf of Covered Person S.D., claim number 1071626-02, during the course of S.D.'s purported treatment at Central Park Physical Medicine and Rehabilitation, P.C. (not named a defendant in the Complaint), a No-fault Clinic located at 2 West 86th Street, Suite #1, New York, NY 10024, Plaintiff was billed for at least four pieces of regular DME prescribed by a single HCP at the No-fault Clinic amounting to $1,398.60. On November 1, 2019, pursuant to a prescription issued by Joyce Goldenberg, MD (not named as a defendant in the Complaint) of Central Park Physical Medicine and Rehabilitation, P.C., Defendant Advanced Recovery purportedly provided an LSO for $708.65, a Shoulder Orthosis for $111.07, Cervical Traction Equipment for $502.73, and a Tens Device for $76.25. On January 14, 2020, after receiving the aforementioned DME and orthotic devices, S.D. purportedly underwent an orthopedic evaluation at Steven Struhl, M.D., P.L.L.C (not named a defendant in the Complaint) and ultimately underwent arthroscopic right knee joint shoulder surgeries performed by Steven Struhl, MD (not named a defendant in the Complaint) of Steven Struhl, M.D., P.L.L.C. On that same day, pursuant to a prescription issued by Steven Struhl, MD of Steven Struhl, MD of Steven Struhl, M.D., P.L.L.C., Protechmed, Inc (not named a defendant in the Complaint). purportedly provided a Pneumatic Compressor for $531.06, a Shoulder Orthosis for $111.07, a Cane for $18.75, and a Pneumatic Appliance for $89.56. Plaintiff was billed for at least five pieces of postoperative DME, Rental DME, DME and/or orthotic devices purportedly provided by two different companies amounting to $750.44. On January 31, 2020, pursuant to a prescription issued by Joyce Goldenberg, MD of Central Park Physical Medicine and Rehabilitation, P.C., Defendant Advanced Recovery purportedly provided a Knee Orthosis for $536.08. On February 1, 2020, pursuant to a prescription issued by Steven Struhl, MD of Steven Struhl, M.D., P.L.L.C., Defendant Advanced Recovery purportedly provided a CPM for left shoulder and a Cold Therapy Unit for a twenty-eight day rental

period, with accompanying pad, totaling $3,405.50. On February 29, 2020, pursuant to a prescription issued by Steven Struhl, MD of Steven Struhl, M.D., P.L.L.C., Defendant Advanced Recovery purportedly provided a CPM for left shoulder and a Cold Therapy Unit for a fourteen day rental period totaling $1,694.00. Plaintiff was ultimately billed $7,784.72 in connection with at least thirteen pieces of DME, Rental DME, and orthotic devices.

- In connection with claims submitted on behalf of Covered Person M.G., claim number 1082609-02, during the course of M.G.'s purported treatment at BSS Metropolitan Medical PC d/b/a Bhupinder Singh Sawhney (not named a defendant in the Complaint), a No-fault Clinic located at 599-601, Southern Boulevard, Bronx, NY 10455, Plaintiff was billed for at least eleven pieces of regular DME prescribed by a single HCP at the No-fault Clinic amounting to $2,135.88. On May 11, 2020, pursuant to a prescription issued by Bhupinder Sawhney, MD (not named as a defendant in the Complaint) of BSS Metropolitan Medical PC, Levmic Inc. (not named as a defendant in the Complaint) purportedly provided a Cervical Collar for $183.99, a Cervical Pillow for $22.04, an LSO for $322.98, and an Electric Heat Pad for $20.93. On May 14, 2020, pursuant to a prescription issued by Bhupinder Sawhney, MD of BSS Metropolitan Medical, Levmic Inc. purportedly provided a Foam Rubber Mattress for $155.52, a Bed Table for $101.85, and a General Use Wheelchair Back Cushion for $282.40. On June 30, 2020, pursuant to a prescription issued by Bhupinder Sawhney, MD of BSS Metropolitan Medical, Levmic Inc. purportedly provided an Infrared Heating Lamp for $293.65 and an EMS Unit for $377.60 with accompanying wires for an additional $18.86. On July 2, 2020, pursuant to a prescription issued by Bhupinder Sawhney, MD of BSS Metropolitan Medical, Levmic Inc. purportedly provided an Electric Percussor for $355.56. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting on September 1, 2020, pursuant to a prescription issued by Raz Winiarsky, MD (not named as a defendant in the Complaint) of FJ Orthopaedics & Pain Management PLLC (not named as a defendant in the Complaint), MiiSupply, LLC (not named as a defendant in the Complaint), purportedly provided a SAM Recovery System Controller for a twenty-eight day rental period along with SAM Coupling Patches, totaling $3,516.80. On August 12, 2020, after receiving the aforementioned DME and orthotic devices, M.G. purportedly underwent an orthopedic evaluation at FJ Orthopaedics & Pain Mgmt PLLC and ultimately underwent arthroscopic shoulder surgery performed by Raz Winiarsky, MD of FJ Orthopaedics & Pain Management PLLC on February 18, 2021. On that same day, pursuant to a to a prescription issued by Raz Winiarsky, MD of FJ Orthopaedics & Pain Mgmt PLLC, Ares Medical Supplies, LLC (not named a defendant in the Complaint) purportedly provided a Shoulder Orthosis for $111.07 and Lima Supply Inc. (not named a defendant in the Complaint) purportedly provided a Positioning Bath Chair for $285.00 and a Pneumatic Appliance for $56.04 Thereafter, Plaintiff was billed for at least nine pieces of postoperative DME, Rental DME, DME and/or orthotic devices

amounting to $12,152.60. On September 10, 2020, pursuant to a prescription issued by Raz Winiarsky, MD of FJ Orthopaedics & Pain Mgmt PLLC, Defendant Advanced Recovery purportedly provided a CPM for right shoulder for a twenty-eight day rental period, a CTU for right shoulder for a twenty-eight day rental period, with accompanying pad, totaling $3,425.50. On September 21, 2020 pursuant to a prescription issued by Raz Winiarsky, MD of FJ Orthopaedics & Pain Mgmt PLLC, MiiSupply, LLC, purportedly provided a SAM Recovery System Controller for a twenty-eight day rental period along with SAM Coupling Patches, totaling $3,516.80. On October 8, 2020, pursuant to a prescription issued by Raz Winiarsky, MD of FJ Orthopaedics & Pain Mgmt PLLC, Defendant Advanced Recovery purportedly provided a CPM for right shoulder for a fourteen day rental period and a CTU for right shoulder for a fourteen day rental period totaling $1,694.00. On October 19, 2020, pursuant to a prescription issued by Raz Winiarsky, MD of FJ Orthopaedics & Pain Mgmt PLLC, MiiSupply, LLC, purportedly provided a SAM Recovery System Controller for a twenty-eight day rental period along with SAM Coupling Patches, totaling $3,516.80. Plaintiff was ultimately billed $17,804.78 in connection with at least twenty-five pieces of DME, Rental DME, and orthotic devices.

- In connection with claims submitted on behalf of Covered Person D.P., claim number 1023203-04, during the course of D.P.'s purported treatment at Central Park Physical Medicine and Rehabilitation, P.C. (not named a defendant in the Complaint), a No-fault Clinic located at 2825 3rd Avenue. 4th Floor, Bronx, NY 10455, Plaintiff was billed for at least five pieces of regular DME and orthotic devices prescribed by a single HCP at the No-fault Clinic amounting to $1,762.81. On March 21, 2018, pursuant to a prescription issued by Joyce Goldenberg MD (not named as a defendant in the Complaint) Defendant Advanced Recovery purportedly provided a Knee Orthosis for $536.08, a Shoulder Orthosis for $251.34, Tens Unit and accompanying gel for $121.25, an LSO for $806.64, and a Wrist Orthosis for $47.50. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting on March 21, 2018, pursuant to a prescription issued by Joyce Goldenberg, MD of Central Park Physical Medicine and Rehabilitation purportedly provided a Cervical Traction Equipment for a thirty day rental period, totaling $1,507.80, and a subsequent thirty day rental period starting on April 20, 2018, totaling $1,507.80. On March 27, 2018, after receiving the aforementioned DME and orthotic devices, D.P. purportedly underwent an orthopedic evaluation at Steven Struhl, M.D., L.L.C. (not named as a defendant in the Complaint) and ultimately underwent arthroscopic left shoulder surgery performed by Steven, Struhl, MD (not named a defendant in the Complaint) of Steven Struhl, M.D., L.L.C. on June 18, 2018. On that same day, pursuant to a prescription issued by Marc Ross, PA of Steven Struhl, M.D, L.L.C., Dynamic Supplies, LLC (not named as a defendant in the Complaint) purportedly provided two Half Leg Pneumatic Pressure Appliances totaling $545.30. Also on that same day, pursuant to a prescription issued by Steven

> Struhl, MD of Steven Struhl, M.D, L.L.C., Heel to Toe Foot Center, LLC (not named as a defendant in the Complaint) purportedly provided a Shoulder Orthosis for $40.00. Thereafter, Plaintiff was billed for at least three pieces of postoperative Rental DME amounting to $763.50. On June 21, 2018, pursuant to a prescription issued by Steven Struhl, MD of Steven Struhl, M.D, L.L.C., Defendant Advanced Recovery purportedly provided a CPM for Shoulder for $510.00 and a Cold Therapy Unit along with accompanying pad totaling $253.50, each for a six day rental period. Plaintiff was ultimately billed $4,619.41in connection with at least twelve pieces of DME, Rental DME, and orthotic devices.

153. Such devices are medically unnecessary, and far less expensive and intrusive courses of treatment, such as the provision of inexpensive cold packs, would provide the same if not better treatment than the complex devices provided by the Retail Defendants. In that regard, the supply of such items was motivated by money, without regard to the actual need of the Covered Persons, for the express purpose of increasing the amount of reimbursement sought from insurers in general, and Plaintiff in particular.

**1. Fraudulent billing of Continuous Passive Motion Machines**

154. In furtherance of the scheme to defraud alleged herein, the Retail Defendants, through Advanced Recovery, routinely submitted bills to Plaintiff for Continuous Passive Motion ("CPM") devices that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

155. As a matter of pattern, practice, and protocol, the Retail Defendants, through Advanced Recovery, submitted to Plaintiff prescription forms which they knew or should have known to be fabricated and/or fraudulently altered and/or duplicated, in order to misrepresent that CPM devices were medically necessary, when in fact, the CPM devices were provided, if at all, to financially enrich the Retail Defendants through a fraudulent protocol of treatment.

156. CPM is a modality of post-surgical treatment in which joint motion is provided by a machine without active contraction of muscle groups. A CPM device allows passive movement

to be performed to a joint for hours at a time. The theory behind CPM is that recovery will be accelerated by decreasing soft tissue stiffness, increasing range of motion, and promoting healing of joint surfaces in soft tissues, and preventing the development of adhesions. A typical CPM device consists of a carriage for support of the extremity and a controller that is programmed to passively flex and extend the joint through a set range of motion, speed, pause and duration.

157. CPM devices have no medical utility except in limited post-operative circumstances, such as total knee replacements, and other knee indications including rehabilitation following repair of an anterior cruciate ligament prior to active physical therapy.

158. CPM is not medically useful as a treatment following basic arthroscopic surgical procedures, does not provide any long-term benefit to post-operative management of Covered Persons, is no more effective than standard physical therapy and is not supported by the medical literature:

- A systematic review of rehabilitation methods after arthroscopic rotator cuff repair was done by Anthony Yi, et al., and published in the journal *Sports Health* in 2015 (7:326-334), which concluded that it is unknown whether CPM offers any benefit after shoulder surgery. In addition, research has shown that CPM does not have any advantage for patients having knee surgery. For example, in patients having a total knee replacement, the American Association of Orthopedic Surgery (AAOS) has a Guideline that states: "Strong evidence supports that CPM after knee arthroplasty does not improve outcomes."

- A Cochrane Review was published that involved an analysis of multiple articles, and their conclusion was: *CPM does not have clinically important effects on active knee flexion ROM, pain, function, or quality of life to justify its routine use.* In addition, in a study by Herbold, et al., a matched cohort of patients with total knee replacement were compared, and their conclusion was: *The outcome variables of 61 matched pairs of CPM users and non-CPM users were reported. No statistically significant differences were found in any of the outcomes.*

- A study published in the July 1998 Journal of Bone and Joint Surgery comparing the results of 31 patients randomly assigned CPM therapy or manual passive range of motion exercises for post-operative management

of rotator cuff repair, found no significant differences in Shoulder Pain and Disability index scoring for pain and functional disability of each group, and no significant differences between the two groups with regard to the range of motion or strength.

- A study published in the July 16, 2014 Journal of Bone and Joint Surgery comparing the results of 40 patients post treatment of intra-articular knee fractures around the knee, randomly assigned CPM or standardized physical therapy for 48 hours immediately following surgery, found that CPM significantly improved knee flexion in the first 48 hours. However, there was no significant difference in knee pain at 48 hours, no other knee flexion or extension detected at any other time and no benefit of CPM in the immediate post-operative period with regard to knee motion at six months.

159. In addition to these studies, the Centers for Medicare and Medicaid Services ("CMS") issued a National Coverage Determination concluding that CPMs are only necessary after total knee arthroplasty, anterior cruciate ligament repair or reconstruction, after cartilage grafting procedures during the non-weight-bearing period to promote healing, and surgical release of arthrofibrosis of any joint.

160. CMS also stated that CPMs should be provided within 48 hours after surgery and that there is insufficient evidence to justify the use of CPMs beyond 21 days.

161. Notwithstanding that CPM devices are not medically useful as a treatment following routine knee and shoulder arthroscopic surgical procedures such as those performed on Covered Persons, the Retail Defendants, through Advanced Recovery, and pursuant to illicit kickback agreements with the HCPs, filled needless prescriptions for CPM devices to Covered Persons who purportedly underwent such procedures.

162. Notwithstanding the lack of medical literature supporting the use and/or provision of CPM devices for patients that undergo routine arthroscopic procedures, as a matter of pattern, practice and protocol, such devices were routinely prescribed to Covered Persons and supplied

by Advanced Recovery pursuant to a pre-determined protocol of treatment and fraudulent scheme to maximize reimbursement.

163. In a legitimate medical clinic setting, the HCP prescribing post-surgical DME provider should evaluate and document multiple factors for the necessity of the Rental DME, including, but not limited to: (i) whether the Covered Person is capable of using the at-home treatment devices; (ii) whether the DME is likely to help improve the Covered Person's surgical recovery; and (iii) whether the Covered Person is likely to use the DME. In nearly all circumstances, the medical reports neglect to document any such findings nor describe how the Rental DME directly related to each Covered Persons' individual presentation for post-surgical recovery.

164. Moreover, it is extremely improbable that virtually all of the Covered Persons who received DME from Advanced Recovery and other DME providers, that underwent minimally invasive surgical procedures, would ultimately receive the same and/or nearly identical post-surgical DME, despite being differently situated. However, pursuant to the predetermined fraudulent protocols implemented by Advanced Recovery and others, the Covered Persons who underwent a surgical procedure were prescribed virtually identical post-surgical fraudulent Rental DME.

165. In that regard, to the extent that there was a contemporaneously dated operative report issued by the HCP and/or any follow reports, the reports virtually always omitted references to Rental DME prescribed, how it was supposed to be used and how or whether the Rental DME was assisting the Covered Persons' recovery.

166. Furthermore, in keeping with the fact that the prescriptions for Rental DME were not medically necessary and were provided pursuant to predetermined fraudulent protocols, the

Rental DME, and CPMs in particular, purportedly prescribed by the HCPs was almost always prescribed for durations far beyond the accepted medical literature concerning the duration of use for the items.

167. Despite the fact that CPMs are not medically necessary for the injuries suffered by most, if not all the Covered Persons, and the lack of sufficient evidence to justify their use beyond 21 days, Advanced Recovery routinely filled prescriptions systematically provided by the HCPs for CPMs to be used for anywhere between 3 and 6 weeks.

168. Although CPM units can be purchased from legitimate companies for less than Advanced Recovery's accumulated monthly charges for the particular items, Advanced Recovery systematically represent that the inexpensive CPMs dispensed to Covered Persons are high-quality and expensive units by submitting monthly charges that far exceed the true value of the products.

169. Specifically, prior to the change in the maximum reimbursement amount in the Fee Schedule for CPM devices as part of the adoption of the WCB Fee Schedule, the Retail Defendants, through Advanced Recovery, routinely submitted bills to Plaintiff for the rental of CPM devices for use on joints other than the knee, at an inflated daily rate of $85.00 per day per Covered Person, using billing code E0936, resulting in total charges in amounts up to $3,570.00 per Covered Person.

170. In addition, the Retail Defendants, through Advanced Recovery, routinely submitted bills to Plaintiff for the rental of CPM devices for use on the knee, at an inflated daily rate of $75.00 per day per Covered Person, using billing code E0935, resulting in total charges in amounts up to $2,100.00 per Covered Person.

171. Notwithstanding that the Medicare rate for a CPM is only $21.50 per day, and the WCB DME Fee Schedule rates for Knee CPMs and CPMs for other limbs are only $18.88 per day and $31.19 per day, respectively, the charges by Advanced Recovery far exceeded those rates and are grossly inflated in order to maximize their reimbursement in furtherance of the scheme to defraud.

172. After the changes in the reimbursement rates in the WCB DME Fee Schedule, the Retail Defendants, through Advanced Recovery, continued to submit charges for CPMs for medically unnecessary durations, resulting in grossly inflated charges of $873.32 under code E0936, and $528.64 under code E0935, in connection with the predetermined protocol to exploit the payment formulas under the applicable Fee Schedule and maximize its reimbursement. Exhibit "4" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims wherein Advanced Recovery submitted fraudulent bills for the rental of CPM Devices to Plaintiff using billing codes E0935 and/or E0936. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 1011081-02, 1040749-01, 1065027-04, 1087348-02, 1087348-02, 1087994-01, 1095761-02, 1098874-02, 1101535-01, and 1101999-01 in which Advanced Recovery mailed fraudulent claims for CPM Devices, billed under codes E0935 and/or E0936, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiff.

173. The bills mailed by Advanced Recovery were fraudulent in that they misrepresented that (i) the CPM Devices were medically necessary when in fact they were not;

(ii) they were provided pursuant to legitimate prescriptions when in fact they were not; (iii) they were prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics; and (iv) the fee charged for the CPM Device was not in excess of applicable Fee Schedule in existence at the time the claim was mailed and/or the maximum reimbursement amount allowed under the No-fault Law. In these and numerous other ways alleged herein, the Retail Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiff for expensive CPM Devices that they were not entitled to receive under the No-fault law and implementing regulations.

**2. Fraudulent billing of Cold Water Circulation Units**

174. In furtherance of the scheme to defraud alleged herein, the Retail Defendants, through Advanced Recovery, submitted bills to Plaintiff for Cold Water Circulation Units also known as cold therapy units ("CTUs") that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

175. CTUs combine cold temperatures and compression to decrease pain, discomfort, bleeding, swelling, use of medication, length of hospital stay and/or length of recovery following injury or surgery to an extremity. The theory behind cold therapy is that by decreasing the temperature of the tissue, which produces vasoconstriction, pain is lessened, muscle spasm is decreased and inflammation is reduced.

176. CTUs utilize pneumatic or mechanical pumps that may be battery or electrically operated, and the intended function of the pump is to provide cyclical compression and cooling to the affected area. The purpose of the compression is to remove fluid and decrease edema while providing the cooling. The devices generally consist of two basic parts: a wrap or wrap system

designed to cover specific areas of the body, and a control unit or pump, which is filled with ice and/or water. The control unit or pump circulates the cooled water through the wrap system to the affected area

177. On information and belief, CTUs have been found to be useful for post-operative care of joint reconstruction surgeries in the 3-4 days immediately following surgery.

178. As a matter of pattern, practice and protocol, the Retail Defendants, through Right Advanced Recovery submitted to Plaintiff, prescription forms which they knew to be fabricated and/or fraudulently altered and/or duplicated, in order to misrepresent that CTUs were medically necessary, when in fact, the CTUs were provided, if at all, to financially enrich the Retail Defendants through a fraudulent protocol of treatment.

179. Specifically, notwithstanding that CTUs are only medically necessary, if at all useful, for post-operative care of joint reconstruction surgeries, the Retail Defendants, through Advanced Recovery, and pursuant to illicit kickback agreements with the HCPs, routinely issued prescriptions for CTUs for patients that underwent basic joint procedures and/or did not have any surgery whatsoever.

180. On information and belief, while CTUs are dispensed to reduce pain, swelling and inflammation, numerous studies have concluded that they are no more effective than standard ice therapy including the application of ice packs and compression.

181. For instance, in a study published in the January 2008 Journal of Knee Surgery, the researchers compared postoperative pain control after knee arthroscopy in 53 patients with use of a CTU device compared with a traditional ice therapy regimen, and found that though pain intensity was similar between groups throughout the course of the study, there were no significant differences found in the groups regarding functional ability.

182. In addition, in a systematic review of the literature concerning the use of cryotherapy in acute soft tissue injury published in the July 2001 edition of the International Journal of Sports Medicine, the review concluded that the optimal method of ice application is wet ice applied directly to the skin through a wet towel and that the target temperature reduction is to 10-15 °C.

183. Furthermore, in a study following 110 patients to assess the effectiveness of postoperative cold therapy after ACL reconstructions, published in the September-October 1996 American Journal of Sports Medicine, the review concluded that ice bags and cooling pads appeared equally effective.

184. In addition to these studies, on June 9, 2019, the Center for Medicare and Medicaid Studies ("CMS") issued a Local Coverage Determination—No. L33735—in which it concluded that active cold therapy units were not medically necessary due to the availability of alternate therapy, such as traditional cold-pack application, which produce the same therapeutic outcome.

185. On information and belief, even when CTUs are medically useful, they should be used for no more than three to four days immediately following surgery.

186. Despite the fact that CTUs are not medically necessary, Advanced Recovery routinely filled prescriptions systematically provided by the HCPs for the devices to be used for anywhere between two (2) and four (4) weeks.

187. On information and belief, Advanced Recovery obtained these prescriptions pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between themselves and the No-fault Clinics at which the HCPs were employed.

188. Although the CTUs can be purchased from legitimate companies for less than Advanced Recovery's accumulated monthly charges for the particular items, Advanced Recovery systematically represents that the inexpensive CTUs dispensed to Covered Persons are high-quality and expensive units by submitting monthly charges that far exceed the true value of the products.

189. Specifically, the Retail Defendants, through Advanced Recovery, routinely submitted bills to Plaintiff for the rental of CTU devices at a rate of $36.00 per day per Covered Person, under billing code E0218, resulting in total charges in amounts ranging from $1,008.00 to $1,512.00 per Covered Person, divided between two billing submissions to conceal the total charge of the rental, along with accompanying pad billed separately under code E0249 for $37.50. Exhibit "5" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims wherein Advanced Recovery submitted fraudulent bills for CTU devices to one or more Plaintiff.

190. Separate and apart from the above, upon the change in the Fee Schedule that occurred in 2022 in which codes E0218 and E0236 were added to the Fee Schedule, Advanced Recovery began billing for CTUs as a sale under E0236 in the amount of $325.08. Similar to the billing for CTUs under code E0218, this item was and still is being billed pursuant to a fraudulent protocol of treatment. Moreover, the item is medically unnecessary. Anthem Cooling Devices and Combine Cooling/Heating Devices (June 28, 2024), https://www.anthem.com/medpolicies/abc/active/mp_pw_c164424.html. *See also* Blue Cross Medical Policy Cooling Devices Used in the Outpatient Setting, https://www.bluecrossma.com/common/en_US/medical_policies/510%20Cooling%20Devices%20Used%20in%20the%20Outpatient%20Setting%20prn.pdf; Blue Cross Cooling Devices

Used in the Outpatient Setting, https://www.blueshieldca.com/content/dam/bsca/en/provider/docs/medical-policies/Cooling-Devices-Outpatient-Setting.pdf.

**3. Fraudulent billing of Sustained Acoustic Medicine Devices**

191. In furtherance of the scheme to defraud alleged herein, the Retail Owners, through Advanced Recovery, routinely submitted bills to Plaintiff for Sustained Acoustic Medicine ("SAM") devices that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

192. Each of the Covered Persons that received SAM units were involved in minor impact accidents and suffered only soft-tissue injuries, to the extent they suffered any injuries at all.

193. Shortly after the accident, each of the Covered Persons visited multidisciplinary No-fault Clinics that, in exchange for kickbacks and/or other financial compensation, referred the Covered Persons for a standard battery of treatment that included, but is not limited to, referrals for physical therapy, chiropractic treatment, acupuncture, electrodiagnostic testing and basic DME. Indeed, within 30 days of the accident, the Covered Persons are dispensed a substantial and similar battery of regular DME, as well as expensive rental pain management DME, such as SAM Units from Defendant Advanced Recovery, pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription.

194. After the initial round of unnecessary treatment, upon a follow up visit with the No-fault Clinics, in most cases, many of the Covered Persons are referred for surgical procedures performed at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.

195. After the surgery at the ASC, the Covered Persons are also purportedly provided with expensive rental post-surgical, rehabilitative DME and/or compression devices, along with several pieces of Rental DME. By way of example and not limitation

196. The SAM device is a battery powered, wearable and portable device that purports to produce ultrasound at a frequency of three (3) megahertz in order to provide heat-related medical therapy through the delivery of low-intensity acoustic waves for the treatment of acute and chronic tendinopathies, muscle strain or spasms, or pain associated with osteoarthritis for a two-to-six-week period.

197. On information and belief, notwithstanding its intended use, the ultrasound purportedly provided by the SAM device is insufficient to produce clinical effective heating.

198. Moreover, the heating pattern of the SAM device is circumscribed and not useful for large areas of tissues such as prescribed by the referring HCP. For example, the ultrasound purportedly provided by the SAM device only heats the tissue directly below the transducer, making it impractical for heating large areas such as trapezius muscles and cervical or lumbosacral paraspinal muscles.

199. Notwithstanding the typical uses for the devices, referring HCPs routinely issue prescriptions for SAM Units for Covered Persons that were involved in minor impact accidents and suffered only minor, soft tissue injuries, to the extent the suffered any injuries at all, and in some instances, underwent or are about to undergo outpatient arthroscopic surgical procedures, along with a host of other expensive DME devices, designed to upcharge insurers for tens of thousands of dollars as part of a fraudulent protocol of medically unnecessary treatments. In that regard, whether prior to, contemporaneously with, or sometime after the dispensing of the SAM device, the Covered Persons receive a substantial and similar battery of regular and rental DME

pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription. The SAM Units are often prescribed with one or more other rental DME devices such as CPMs, CTUs, laser therapy and/or pneumatic compression devices. Each of these devices are typically rented to the Covered Persons for a period of three to eight weeks either before or within a few days of the patients' surgery.

200. On information and belief, the prescriptions for the SAM Units are never given to the Covered Persons. Instead, the prescriptions are sent from many of the same referring medical clinics directly to a predetermined SAM Unit provider in exchange for a kickback and/or other financial incentive or compensation.

201. In numerous cases, the prescriptions from the referring providers are fabrications as part of the scheme to maximize reimbursement through these medically unnecessary rental items and the SAM Units in particular.

202. Prior to the change in the fee schedule effective April 2022, upon receipt of the prescriptions for the SAM devices, Advanced Recovery submitted to insurers bills for the SAM devices in the amount of $5,150.00 under code E1399 for a rental period spanning four (4) to six (6) weeks, regardless of actual patient need in order to maximize reimbursement.

203. Following the change in the fee schedule effective April 2022 until June 2023, upon receipt of the prescriptions for the SAM devices, Advanced Recovery submitted to insurers bills for the SAM devices under code E1399 in the amount of $3,348.00, charging a daily rental rate of $93.00 per day for a thirty-six day rental, along with separate charges under code E1399 totaling $419.19 for accompanying coupling patches, regardless of actual patient need in order to maximize reimbursement.

204. Through June 2023, to the extent the SAM Units purportedly provided to Covered Persons on a rental basis, and accompanying coupling patches are reimbursable at all, the Retail Owners, through Advanced Recovery, billed Plaintiff far in excess of that permissible under the Fee Schedule.

205. Thereafter, to the extent the SAM Units purportedly provided to Covered Persons were provided at all, they continued to be provided pursuant to a predetermined protocol irrespective of medical necessity.

206. Oftentimes, the devices are delivered to the Claimants without their knowledge or expectation. Upon delivery, proper instruction on the proper use of the device and the risks associated with the device are not explained to the Claimants. In many cases and as a result, the Claimants do not use the device and/or use the device improperly, posing a risk to the Claimants' health as well as rendering the device ineffective.

207. The Retail Owners, through Advanced Recovery, routinely submitted to Plaintiff bills for SAM devices under code E1399, which were not provided as billed, if any were provided at all, and were supplied pursuant to a fraudulent protocol of treatment. Exhibit "6" in the accompanying Compendium of Exhibits is a representative sample of claims submitted by Advanced Recovery to Plaintiff where Advanced Recovery submitted fraudulent bills for SAM devices under code E1399.

208. Furthermore, by way of example and not limitation, the Appendix to the Complaint identifies a representative sample of predicate acts, including claim nos. 1058106-01, 1101016-05, 1104159-02, 1111209-02, 1113413-04, 1114538-03, and 1122132-01 in which Advanced Recovery mailed Plaintiff fraudulent claims for SAM units, billed under code E1399, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for

kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiff.

209. The bills mailed by Advanced Recovery were fraudulent in that they misrepresented that the SAM devices (i) were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; (iii) they were prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics; and (iv) the fee charged for the SAM devices was not in excess of the applicable Fee Schedule in existence at the time the claim was mailed and/or the maximum reimbursement amount allowed under the No-fault Law. In these and numerous other ways alleged herein, the Retail Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiff for expensive SAM devices that they were not entitled to receive under the No-fault law and implementing regulations.

**<u>FEE SCHEDULE SCHEME TO DEFRAUD</u>**

**1. Fraudulent Billing for Custom Fit DME and/or Orthotic Devices.**

210. The term "custom-made" and/or "custom-fabricated" as used in the New York State Medicaid Fee Schedule refers to any DME, orthopedic footwear, orthotics or prosthetics fabricated solely for a particular person from mainly raw materials that cannot be readily changed to conform to another person's needs. *See, e.g.,* Durable Medical Equipment, Orthotics, Prosthetics and Supplies Policy Guidelines, New York State Department of Health (March 1, 2019), at 4.

211. Raw materials are used to create custom-made DME, orthopedic footwear, orthotics or prosthetics based on a particular person's measurements, tracings, and patterns. *Id.*

212. To bill under any Fee Schedule code reserved for custom-made DME and/or orthotic devices, a retailer is required to measure the recipient of the items and fabricate the custom-made item based on those measurements. *Id.*

213. The term "custom fitted" or "custom fit" as used in the HCPCS Level II code set, created by Centers for Medicare and Medicaid Services ("CMS") and the source of all codes used to bill for DME contained in the Fee Schedule, refers to expensive pre-fabricated DME and/or orthotic devices that requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e. the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment, and the fitting does require expertise of a certified orthotist or an individual who has specialized training in the provision of orthosis to fit the item to the individual beneficiary. "Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces)—Correct Coding—Revised," Palmetto GBA (CMS's Pricing, Data Analysis and Coding Contractor) (March 12, 2021), https://www.dmepdac.com/palmetto/PDACv2.nsf/DIDC/3HJFX8TFDH~Articles%20and%20Publications~Advisory%20Articles. *See also* Durable Medical Equipment, Orthotics, Prosthetics and Supplies Policy Guidelines, New York State Department of Health (July 1, 2021), at 4; "Durable Medical Equipment, Orthotics, Procedure Codes and Coverage Guidelines," New York State Dep't of Health (August 1, 2019), at 115.

214. In furtherance of the scheme to defraud Advanced Recovery routinely submitted fraudulent bills in support of expensive pre-fabricated orthotic devices that required a fitting and adjustment in which the device has been trimmed, bent, molded, assembled, adjusted, modified, or otherwise customized to fit a specific Covered Person by an individual with expertise, which they never provided.

215. By way of example and not limitation, under the relevant Fee Schedule in existence at the time, the permissible charges for lumbosacral orthoses ("LSOs") range from $43.27, under code L0625 for basic, prefabricated LSOs dispensed off-the-shelf, to $1,150.00 under code L0632 for more complex LSOs that are custom fabricated.

216. In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for LSOs, the Retail Defendants, through Advanced Recovery, routinely submitted bills for LSOs using codes L0627 and L0631, which are reserved for prefabricated DME and/or orthotic devices that require a customized fitting, notwithstanding that a customized fitting was never performed. Exhibit "7" in the accompanying Compendium of Exhibits is a representative sample of claims where Advanced Recovery submitted fraudulent bills for LSOs using codes L0627 and L0631. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 1115957-02, 1114213-02, 1116409-02, 1108122-02, 1095305-02, 1084603-01, 1074716-01, and 1050530-01 in which Advanced Recovery mailed fraudulent claims for LSOs, billed under codes L0627 and L0631, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiff.

217. To the extent any orthotic devices were provided, the Retail Defendants, through Advanced Recovery, provided cheap, prefabricated one-size-fits-all LSOs for which no customized fitting was ever performed.

218. By way of further example and not limitation, under the relevant Fee Schedule in existence at the time, the permissible charges for thoracic lumbar sacral orthoses ("TLSOs") range from $144.00, under code L0450 for basic, prefabricated TLSOs dispensed off-the-shelf, to $1,523.40 under code L0486 for more complex TLSOs that are custom fabricated.

219. In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for TLSOs, the Retail Defendants, through Advanced Recovery, routinely submitted bills for LSOs using code L0456, which is reserved for prefabricated DME and/or orthotic devices that require a customized fitting, notwithstanding that a customized fitting was never performed. Exhibit "8" in the accompanying Compendium of Exhibits is a representative sample of claims where Advanced Recovery submitted fraudulent bills for TLSOs using code L0456. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 1036311-01, 1071229-03, 1080605-01, 1086329-05, 1097540-02, 1084523-01, 1091463-02, 1096390-02, 1099042-02, and 1099230-01, and in which Advanced Recovery mailed fraudulent claims for TLSOs, billed under code L0456, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiff.

220. To the extent any orthotic devices were provided, the Retail Defendants, through Advanced Recovery, provided cheap, prefabricated one-size-fits-all TLSOs for which no customized fitting was ever performed.

221. By way of further example and not limitation, under the relevant Fee Schedule in existence at the time, the permissible charges for knee braces range from $65.00, under code L1830, for a prefabricated knee brace dispensed off-the-shelf, to $1,107.70, under code L1844, for more complex models that are custom fabricated.

222. In furtherance of the scheme to defraud, to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for knee supports, the Retail Defendants, through Advanced Recovery, routinely submitted bills for knee braces using code L1810, L1832, and L1845 which are reserved for prefabricated orthotic devices that require a customized fitting, notwithstanding that a customized fitting was never performed. Exhibit "9" in the accompanying Compendium of Exhibits is a representative sample of claims where Advanced Recovery submitted fraudulent bills for knee braces using codes L1810, L1832, and L1845. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 664535-03, 783020-02, 783296-04, 784022-03, 784242-02, 784575-02, 787055-02, 911775-02, 911792-03, and 912772-07, in which Advanced Recovery mailed fraudulent claims for knee braces, billed under codes L1810, L1832, and L1845, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiff.

223. To the extent any orthotic devices were provided, the Retail Defendants, through Advanced Recovery, provided cheap, prefabricated one-size-fits-all knee braces for which no customized fitting was ever performed.

224. By way of further example and not limitation, under the relevant Fee Schedule in existence at the time, the permissible charges for wrist hand finger orthoses ("WHFOs") range from $178.04, under code L3809 for basic, prefabricated WHFOs dispensed off-the-shelf, to $347.95 under code L3806 for more complex WHFOs that are custom fabricated.

225. In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for WHFOs, the Retail Defendants, through Advanced Recovery, routinely submitted bills for WHFOs using code L3807, which is reserved for prefabricated orthotic devices that require a customized fitting, notwithstanding that a customized fitting was never performed. Exhibit "10" in the accompanying Compendium of Exhibits is a representative sample of claims where Advanced Recovery submitted fraudulent bills for WHFOs using code L3807. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 1101999-01, 1095761-02, 1051237-02, 1043612-02, 1028765-02, and 795537-03, in which Advanced Recovery mailed fraudulent claims for WHFOs, billed under code L3807, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiff.

226. To the extent any orthotic devices were provided, the Retail Defendants, through Advanced Recovery, provided cheap, prefabricated one-size-fits-all wrist braces for which no customized fitting was ever performed.

227. By way of further example and not limitation, under the relevant Fee Schedule in existence at the time, the permissible charges for Ankle foot orthosis ("AFOs") range from $45.00,

under code L1902 for basic, prefabricated AFOs dispensed off-the-shelf, to $750.00 under code L1970 for more complex AFOs that are custom fabricated.

228. In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for AFOs, the Retail Defendants, through Advanced Recovery, routinely submitted bills for AFOs using code L1971, which is reserved for prefabricated orthotic devices that require a customized fitting, notwithstanding that a customized fitting was never performed. Exhibit "11" in the accompanying Compendium of Exhibits is a representative sample of claims where Advanced Recovery submitted fraudulent bills for AFOs using code L1971. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 1109637-03, 1101999-01, 1096805-01, 1090335-02, 1087126-01, 1079439-01, 1077294-01, and 1063338-01, in which Advanced Recovery mailed fraudulent claims for AFOs, billed under code L1971, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiff.

229. To the extent any orthotic devices were provided, the Retail Defendants, through Advanced Recovery, provided cheap, prefabricated one-size-fits-all ankle braces for which no customized fitting was ever performed.

230. The bills mailed by Advanced Recovery were fraudulent in that they misrepresented that (i) the orthotic devices was medically necessary when in fact it was not; (ii) it was provided pursuant to legitimate prescriptions when in fact it was not; (iii) it was prescribed by legitimate medical providers when in fact it was provided pursuant to illegal kickback and/or

financial compensation arrangements with No-Fault Clinics; and (iv) the fee charged for the orthotic devices was not in excess of applicable Fee Schedule in existence at the time the claim was mailed and/or the maximum reimbursement amount allowed under the No-fault Law. In these and numerous other ways alleged herein, the Retail Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiff for expensive orthotic devices that they were not entitled to receive under the No-fault law and implementing regulations.

**2. Fraudulent Billing for Cervical Traction Equipment**

231. Advanced Recovery routinely submitted fraudulent bills to Plaintiff for what it refers to as "cervical traction equipment" under Fee Schedule Code E0855.

232. The cervical traction equipment purportedly provided by Advanced Recovery are inexpensive replicas or knockoffs of a trademarked cervical traction unit, with a wholesale price that is a fraction of the cost associated with the authentic device. In that regard, to the extent anything was supplied to Covered Persons at all, Advanced Recovery provided basic, inexpensive cervical traction units pursuant to a predetermined course of treatment, based on generic prescriptions, regardless of medical necessity and misrepresented the nature, quality, and cost of the items in each of the bills submitted to Plaintiff.

233. By billing for cervical traction units, it purportedly provided under code E0855, the Defendants, through Advanced Recovery, falsely represented that they provided expensive, medically necessary cervical traction units when in actuality they provided cheap, inexpensive items that in many cases were replicas or knockoffs of trademarked items. By way of example and not limitation, Exhibit "12" in the accompanying Compendium of Exhibits is a representative sample of claims where Advanced Recovery submitted fraudulent bills for "cervical traction equipment" to Plaintiff. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 1027635-03,

1088911-02, 1101999-01, 1103448-01, 1104159-02, 1104630-03, 1105988-02, 1109637-03, 1121064-02, and 1126711-01, in which Advanced Recovery mailed fraudulent claims for "cervical traction equipment," billed under code E0855, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiff.

234. The bills mailed by Advanced Recovery were fraudulent in that they misrepresented that (i) the cervical traction equipment was medically necessary when in fact it was not; (ii) it was provided pursuant to legitimate prescriptions when in fact it was not; (iii) it was prescribed by legitimate medical providers when in fact it was provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics; and (iv) the fee charged for "cervical traction equipment" was not in excess of applicable Fee Schedule in existence at the time the claim was mailed and/or the maximum reimbursement amount allowed under the No-fault Law. In these and numerous other ways alleged herein, the Retail Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiff for expensive "cervical traction equipment" that they were not entitled to receive under the No-fault law and implementing regulations. The Non-Fee Schedule Scheme to Defraud

**NON-FEE SCHEDULE SCHEME TO DEFRAUD**

**1. Fraudulent Billing of Non-Fee Schedule Items under Fee Schedule Codes**

235. In furtherance of the scheme to defraud alleged herein, the Retail Defendants, through Advanced Recovery, routinely submitted bills to Plaintiff for "TENS Units" under code E0730 in the amount of $76.25, which were not provided as billed, if any were provided at all. Under the relevant Fee Schedule in existence at the time, code E0730 is reserved for DME

satisfying the description of "TENS four lead," transcutaneous electrical nerve stimulation (tens) device, four or more leads, for multiple nerve stimulation.

236. To the extent any DME and/or orthotic device was provided, the Retail Defendants, through Advanced Recovery , provided a cheap "digital therapy machine", based on generic prescriptions, regardless of medical necessity and misrepresented the nature, quality, and cost of the items in each of the bills submitted to Plaintiff.

237. By billing for cheap, "digital therapy machines", under code E0730, the Retail Defendants, through Advanced Recovery, falsely represented that they provided medically necessary TENS Units, when they did not. By way of example and not limitation, Exhibit "13" in the accompanying Compendium of Exhibits is a representative sample of claims where Advanced Recovery submitted fraudulent bills for TENS Units to Plaintiff under code E0730. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 1088911-02, 1105988-02, 1109637-03, 1111641-03, 1113055-03, 1113413-04, 1120279-01, 1121064-02, 1122132-01, and 1126711-01in which Advanced Recovery mailed fraudulent claims for TENS Units, billed under code E0730, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiff.

238. In furtherance of the scheme to defraud alleged herein, the Retail Defendants, through Advanced Recovery, routinely submitted bills to Plaintiff for "Lumbar Seats" under code T5001 in the amount of $756.03, which were not provided as billed, if any were provided at all.

Under the relevant Fee Schedule in existence at the time, code T5001 is reserved for DME satisfying the description of "Positioning seat for persons with special orthopedic needs."

239. To the extent any DME and/or orthotic device was provided, the Retail Defendants, through Advanced Recovery , provided a cheap pillow based on generic prescriptions, regardless of medical necessity and misrepresented the nature, quality, and cost of the items in each of the bills submitted to Plaintiff.

240. By billing for cheap, inexpensive pillows under code T5001, the Retail Defendants, through Advanced Recovery, falsely represented that they provided medically necessary Lumbar Seats, when they did not. By way of example and not limitation, Exhibit "14" in the accompanying Compendium of Exhibits is a representative sample of claims where Advanced Recovery submitted fraudulent bills for Lumbar Seats to Plaintiff under code T5001. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 1128266-01, 1127478-02, 1125515-02, 1121922-02 1118630-03, and 1115957-02, in which Advanced Recovery mailed fraudulent claims for Lumbar Seats, billed under code T5001, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary items in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiff.

241. The bills mailed by Advanced Recovery were fraudulent in that they misrepresented that (i) the DME was medically necessary when in fact it was not; (ii) it was provided pursuant to legitimate prescriptions when in fact it was not; (iii) it was prescribed by legitimate medical providers when in fact it was provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics; and (iv) the fee charged for the DME

was not in excess of applicable Fee Schedule in existence at the time the claim was mailed and/or the maximum reimbursement amount allowed under the No-fault Law. In these and numerous other ways alleged herein, the Retail Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiff for expensive DME that they were not entitled to receive under the No-fault law and implementing regulations.

**DISCOVERY OF THE FRAUD**

242. To induce Plaintiff to promptly reimburse their claims for Rental DME, DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud. By way of example and not limitation:

- The Retail Owners, through Advanced Recovery, routinely and deliberately submitted facially valid claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;
- The Retail Owners, through Advanced Recovery, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;
- The Retail Owners, through Advanced Recovery, knowingly misrepresented and concealed that Advanced Recovery's claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement; and/or
- The Retail Owners, through Advanced Recovery, knowingly and deliberately concealed the amounts Advanced Recovery was entitled to be reimbursed in the bills submitted to Plaintiff by misrepresenting the codes and reimbursement amounts as part of the scheme to manipulate the payment formulas under the applicable DME Fee Schedule in order to maximize the charges that they could submit to Plaintiff and other insurers.

243. Plaintiff are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiff in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent

concealment described above, were designed to, and did cause Plaintiff to justifiably rely on them. As a proximate result, Plaintiff has incurred damages of more than $1,500,000.00 based upon the fraudulent bill submissions.

244. Based upon Defendants' material misrepresentations and their serial efforts to conceal the various components to their scheme to defraud, Plaintiff did not discover and could not have reasonably discovered the injury alleged herein until July 2023.

**FIRST CLAIM FOR RELIEF**

**AGAINST DEFENDANTS HOROWITZ, GLADKOVITSER, ROBINZON, PELMAN, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5**

**(RICO, pursuant to 18 U.S.C. § 1962(c))**

245. The allegations of paragraphs 1 through 244 are hereby repeated and re-alleged as though fully set forth herein.

**THE RICO ENTERPRISE**

246. At all times relevant herein, Advanced Recovery Equipment & Supplies LLC was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

247. From, in or about June 2012 through the date of the filing of this Complaint, Defendants Horowitz, Gladkovitser, Robinzon, Pelman, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 were "persons" under the RICO statute and knowingly conducted and participated in the affairs of the Advanced Recovery Equipment & Supplies LLC enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

248. At all relevant times mentioned herein, Defendants Horowitz, Gladkovitser, Robinzon, Pelman, together with others unknown to Plaintiff, exerted control over and directed the operations of the Advanced Recovery Equipment & Supplies LLC enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff, that were based, in part, on the utilization of fraudulent prescriptions.

249. On information and belief, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing inexpensive Rental DME, DME and/or orthotic devices, to the extent any such items were in fact provided, pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as well as bogus documentation to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendants Horowitz, Gladkovitser, Robinzon, Pelman required, in furtherance of the scheme to defraud, to obtain payment from Plaintiff for fraudulent DME and/or orthotic device claims.

250. On information and belief, it was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiff.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

251. The racketeering acts set forth herein were carried out on a continued basis for more than a nine-year period, were related and similar and were committed as part of the ongoing

scheme of Defendants Horowitz, Gladkovitser, Robinzon, Pelman, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 to fraudulently bill for Rental DME, DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

252. This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Advanced Recovery Equipment & Supplies LLC continues to pursue collection on the fraudulent billing to the present day.

253. As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Horowitz, Gladkovitser, Robinzon, Pelman, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the Advanced Recovery Equipment & Supplies LLC enterprise based upon materially false and misleading information.

254. Through the Advanced Recovery Equipment & Supplies LLC enterprise, Defendants Horowitz, Gladkovitser, Robinzon, Pelman submitted numerous fraudulent claim forms seeking payment for Rental DME, DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of Covered Persons as billed. The bills and supporting documents that were sent by Defendants Horowitz, Gladkovitser, Robinzon, Pelman, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Horowitz, Gladkovitser, Robinzon, Pelman, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the

formation of the Advanced Recovery Equipment & Supplies LLC enterprise through the filing of this Complaint.

255. A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants Horowitz, Gladkovitser, Robinzon, Pelman, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

256. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

257. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

258. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff has been injured in their business and property and have been damaged in the aggregate amount presently in excess of $1,500,000.00, the exact amount to be determined at trial.

259. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Horowitz, Gladkovitser, Robinzon, Pelman, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ADVANCED RECOVERY, HOROWITZ, GLADKOVITSER, ROBINZON, AND PELMAN**

**(Common Law Fraud)**

260. The allegations of paragraphs 1 through 244 are hereby repeated and realleged as though fully set forth herein.

261. Defendants Advanced Recovery, Horowitz, Gladkovitser, Robinzon, and Pelman made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiff for payment.

262. Each and every bill and supporting documentation submitted by Defendants Advanced Recovery, Horowitz, Gladkovitser, Robinzon, and Pelman to Plaintiff set forth false and fraudulent amounts for reimbursement for Rental DME, DME and/or orthotic devices that they purportedly supplied to Covered Persons. The false representations contained therein not only were intended to defraud Plaintiff but constitute a grave and serious danger to the Covered Persons and the consumer public.

263. Defendants Advanced Recovery, Horowitz, Gladkovitser, Robinzon, and Pelman intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and cost of the DME purportedly supplied to Covered Persons;
- False and misleading statements as to the amounts Advanced Recovery was entitled to be reimbursed under the No-fault Law;
- False and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the Covered Persons; (b) not billed in excess of the maximum permissible monthly rental charge or maximum accumulated rental charge for such equipment, supplies and services provided on a rental basis under the applicable Fee Schedule; (c) not billed in excess of the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service prior to April 4, 2022; (d) not billed in excess of the lesser of the providers' acquisition cost plus 50% or the usual and customary price charged by durable medical equipment providers to the general public if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service after April 4, 2022 and/or (e)

not billed in excess of one-tenth of the acquisition cost to the durable medical equipment provider, calculated on a pro-rata basis using a 30-day month, for dates of service on or after June 1, 2023;

- False and misleading prescriptions for the DME purportedly supplied to Covered Persons, generically describing the item to conceal the type of item being prescribed; and/or
- False and misleading prescriptions for DME, concealing the fact that the (a) DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby the Retail Owners, through Advanced Recovery, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated HCPs to prescribe large amounts of substantially similar, medically unnecessary DME; (b) DME was not covered by the applicable DME Fee Schedule; and (c) DME was generically described on the prescriptions, all of which was designed to permit the Retail Owners, through Advanced Recovery, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiff and other insurers.

264. The foregoing was intended to deceive and mislead Plaintiff into paying Defendants Advanced Recovery's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

265. Defendants Advanced Recovery, Horowitz, Gladkovitser, Robinzon, Pelman knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiff to rely thereon.

266. Plaintiff did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiff was led to believe existed as a result of the acts of fraud and deception of Defendants Advanced Recovery, Horowitz, Gladkovitser, Robinzon, Pelman.

267. Had Plaintiff known of the fraudulent content of the bills, prescriptions, and delivery receipts, they would not have paid Defendant Advanced Recovery's claims for No-fault insurance benefits submitted in connection therewith.

268. Furthermore, the far-reaching pattern of fraudulent conduct by Defendants Advanced Recovery, Horowitz, Gladkovitser, Robinzon, Pelman evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiff to recovery of exemplary and punitive damages.

269. By reason of the foregoing, Plaintiff has sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $1,500,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

**THIRD CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ADVANCED RECOVERY, HOROWITZ, GLADKOVITSER, ROBINZON, AND PELMAN**

**(Unjust Enrichment)**

270. The allegations of paragraphs 1 through 244 are hereby repeated and realleged as though fully set forth herein.

271. By reason of their wrongdoing, Defendants Advanced Recovery, Horowitz, Gladkovitser, Robinzon, Pelman have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiff that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

272. Plaintiff is therefore entitled to restitution from Defendants Advanced Recovery, Horowitz, Gladkovitser, Robinzon, Pelman in the amount by which they have been unjustly enriched.

273. By reason of the foregoing, Plaintiff have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be

in excess of $1,500,000.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

**FOURTH CLAIM FOR RELIEF**

**AGAINST ADVANCED RECOVERY**

**(Declaratory Judgment under 28 U.S.C. § 2201)**

274. The allegations of paragraphs 1 through 244 are hereby repeated and realleged as though fully set forth herein.

275. At all relevant times mentioned herein, each and every bill mailed by Defendants Horowitz, Gladkovitser, Robinzon, Pelman, through Advanced Recovery, to Plaintiff sought reimbursement in excess of the amounts authorized by the No-fault Law and New York State Medicaid Fee Schedule by materially misrepresenting the Rental DME, DME and/or orthotic devices provided, if provided at all, as well as the cost and quality of the billed for Rental DME, DME and/or orthotic devices.

276. To the extent the DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which Advanced Recovery's wholesale cost was a mere fraction of the amount they charged Plaintiff and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

277. At all times relevant herein, Advanced Recovery exploited the No-fault Law and New York State Medicaid Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiff, in particular, through the submission of fraudulent billing documents that misrepresented the nature,

quality and cost of items that both are and are not listed on the relevant fee schedule purportedly provided to Covered Persons.

278. In view of Advanced Recovery's submission of fraudulent bills to Plaintiff, Plaintiff contend that the Retail Defendants have no right to receive payment for any pending bills they have submitted because:

- Advanced Recovery made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiff;
- Advanced Recovery made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for DME that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

279. As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the Rental DME, DME and/or orthotic devices purportedly supplied to Covered Persons and the amounts they were entitled to be reimbursed, which they never supplied to Covered Persons, in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they were entitled to receive, it is respectfully requested that this Court issue an order declaring that Advanced Recovery is not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiff, therefore, is under no obligation to pay any of Retail Defendants' No-fault claims.

280. Plaintiff has no adequate remedy at law.

281. Advanced Recovery will continue to bill Plaintiff for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiff has no obligation to pay the

pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demand a trial by jury.

**WHEREFORE,** Plaintiff demands judgment as follows:

i) Compensatory damages in an amount in excess of $1,500,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii) Punitive damages in such amount as the Court deems just;

iii) Treble damages, costs, and reasonable attorneys' fees on the First Claim for Relief, with prejudgment interest;

iv) Compensatory and punitive damages on the Second Claim for Relief, with prejudgment interest;

v) Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi) Declaratory relief on the Fourth Claim for Relief, declaring that Plaintiff has no obligation to pay any No-fault claims submitted by Advanced Recovery Equipment & Supplies LLC because (1) Advanced Recovery Equipment & Supplies LLC made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff about the Rental DME, DME and/or orthotic devices purportedly supplied to Covered Persons and the amounts they were entitled to be reimbursed in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiff; (2) Advanced Recovery Equipment & Supplies LLC made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff about the

Rental DME, DME and/or orthotic devices purportedly supplied to Covered Persons by submitting claims for Rental DME, DME and/or orthotic devices that they never supplied to Covered Persons; and (3) Advanced Recovery Equipment & Supplies LLC made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for DME that was billed pursuant to a predetermined protocol of treatment without regard to medical necessity; and

vii) Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York,
July 16, 2025

**MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP**

By: /s/ Lee Pinzow
Robert A. Stern, Esq.
James McKenney, Esq.
Lee Pinzow, Esq.
Erica L. Mobley, Esq.
Attorneys for Plaintiff
100 Wall Street, Suite 700
New York, NY 10005
Phone: (212) 858-7769

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**AMERICAN TRANSIT INSURANCE COMPANY,**

**Plaintiff,**

**-against-**

**ADVANCED RECOVERY EQUIPMENT AND SUPPLIES LLC, DANIEL HOROWITZ, RUSSEL GLADKOVITSER A/K/A RUSLAN GLADKOVITSER, JAY ROBINZON, SIMON PELMAN, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,**

**Defendants.**

**CIVIL ACTION**

**25-CV-3940**

**COMPLAINT**

**(TRIAL BY JURY DEMANDED)**

# COMPLAINT

**MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP**
**ATTORNEYS FOR PLAINTIFF**
**100 WALL STREET, SUITE 700**
**NEW YORK, NY 10005**
**TELEPHONE: (212) 858-7769**